[Civ. No. 43301. Second Dist., Div. One. Oct. 29, 1974.]

PACIFIC PALISADES PROPERTY OWNERS ASSOCIATION et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES et al., Defendants and Respondents.

[Civ. No. 43895. Second Dist., Div. One. Oct. 29, 1974.]

PACIFIC PALISADES PROPERTY OWNERS ASSOCIATION et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES, Defendant and Respondent; HARRIS LASKEY et al., Real Parties in Interest and Respondents.

## COUNSEL

Litz & Usher, Ronald A. Litz and Brian J. Kennedy for Plaintiffs and Appellants.

Burt Pines, City Attorney, Claude E. Hilker, Assistant City Attorney, and Jerome Montgomery, Deputy City Attorney, for Defendants and Respondents.

Greenberg & Glusker and Philip Glusker for Real Parties in Interest and Respondents.

**OPINION**

**THOMPSON, J.**—These consolidated appeals from judgments of the trial court denying writs of administrative mandamus raise issues of: (1) the applicability to a building permit of the legislative exemption to the environmental impact report (EIR) requirement of the California Environmental Quality Act stated in Public Resources Code sections 21169 and 21170; and (2) the application of the requirements of the act to action of a municipality approving a tentative subdivision map for a new condominium. We conclude that on the narrow facts of the case at bench: (1) the exemption provisions of the Public Resources Code are applicable to the building permit here involved, and (2) because the exemption is applicable and because there is no indication in the record that sales of condominium units, as opposed to construction of the building which includes them, will have any effect on the environment, no environmental impact report was required as a condition to approval of the tentative map.

The actions at bench were commenced by surrounding property owners (appellants) to set aside various building permits granted to real parties in interest (Builder), and to set aside respondent City's approval of a tentative subdivision map filed by Builder to permit sale of condominium units. Because denial of writs of administrative mandamus to appellants did not affect "fundamental vested rights" possessed by them within the meaning of *Strumsky* v. *San Diego County Employees Retirement Assn.,* 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29], we recite the record in the light most favorable to the determinations of the administrative agencies where the administrative record controls. (See *Topanga Assn. for a Scenic Community* v. *County of Los Angeles,* 11 Cal.3d 506, 510, fn. 1 [113 Cal. Rptr. 836, 522 P.2d 12]; Pub. Resources Code, § 21168.) Where the trial court was required to make findings of fact if requested, we recite the record in the light most favorable to findings expressed or implied.

The parcel of real property which is involved in the case at bench (Property) is an "L" shaped piece of 1.85 acres located in an R-4 zone in the Pacific Palisades area of Los Angeles on which, in 1971, there was located a two-story 35-unit apartment building. The Property fronts on Sunset Boulevard to the southwest and borders Via La Paz on the east. The interior of the "L" is occupied by a service station. The area immediately across Sunset Boulevard is also zoned R-4 and contains apartment houses and a 30-unit condominium project in the course of construction. North and south of the R-4 zones are areas of single family dwellings. The area immediately east of the Property is zoned commercial and contains commercial structures. The R-4 and commercial zones contain no height limits but existing structures do not exceed 45 or 50 feet with the exception of one 90-foot building. The existing R-4 zoning permitted construction of an apartment house of approximately 120 units on the Property.

Builder entered into an escrow to acquire Property in September 1971, intending to replace the 35-unit apartment building with a 109-unit condominium (Building) consisting of five stories with two levels of partially subterranean parking. While the escrow was pending, Builder sought approval from the Pacific Palisades Civic League, which exercised architectural control over Property. The board of the civic league approved Building subject to further approval of final plans by its reversionary rights committee. Builder obtained soil reports and financing, and the escrow closed in January of 1972. Preliminary working drawings were prepared for Building. Final plans for demolition of the existing apartment building and for construction of Building were approved by the city. On August 15, 1972, the final plans were approved by the reversionary rights committee. A demolition contract was let for removal of the existing apartment. Demolition, grading, and building permits were issued by City on September 28, 1972. Pursuant to conditions of the permits, Builder dedicated the easterly two feet of Property to City and posted a sidewalk improvement bond. Excavation and foundation contracts were let by Builder. On October 10, 1972, demolition of the existing apartment building was completed, and the next day excavation of the foundation commenced. The board of the civic league disapproved the action of its reversionary rights committee. On October 13, 1972, appellants filed the first of the two cases at bench, seeking to set aside the various building permits on the ground that they had been granted without the benefit of an environmental impact study. As of that date, Builder had expended and was obligated to expend approximately $400,000 by reason of the demolition of the 35-unit apartment building and for excavation.

Ancillary to their action to set aside the permits, appellants sought a preliminary injunction. The injunction was refused upon Builder's representation that it would not construct Building to a height of over two stories while the action was pending.

In October of 1972, appellants attempted to secure the rollback of zoning in the area of Building by ordinance either imposing a height limit or declaring a moratorium on building permits for residential and commercial construction. The action failed in the planning committee of the city council. Builder filed its tentative tract map with City seeking authorization of a subdivision by which it could sell the 109 condominium units included in Building. While contending no EIR was required, it caused an environmental impact study to be prepared and submitted to the advisory agency of City, the organization charged with first step approval of subdivisions. Appellants submitted their own environmental impact study. The advisory agency had prepared and submitted an EIR. The agency approved the EIR and the condominium tract map as submitted. Appellants appealed the decision of the advisory agency to the planning commission of City. The planning commission conducted extensive public hearings at which appellants were represented. It considered the EIR and denied the appeal. Appellants appealed the holding of the planning commission to the city council. The council again held public hearings. The EIR was made available to members of the city council at the commencement of hearing and some members expressed an inability to read and understand it without a continuance. The city council voted six to disapprove the subdivision and five to disallow the appeal, but since a majority of the council as a whole, i.e., eight votes, was required to sustain the appeal, it failed. A motion to adopt the EIR by the city council failed on a tie vote of five to five. By operation of Business and Professions Code sections 11552 and 11553, the condominium tract map was deemed approved by failure of the governing body of City to sustain the appeal. Appellants then filed the second action involved in this appeal, this time to set aside approval of the condominium tract map.

The trial court held against appellants in both actions and these consolidated appeals followed. Appellants contend: (1) the building permit issued Builder is void because the body issuing it did not consider an environmental impact study before granting the permit; (2) the city council abused its discretion in not considering the environmental impact report when acting upon the appeal from the granting of the condominium tract map; (3) response to the EIR was inadequate; and (4) Builder has misrepresented applicable zoning throughout the proceedings.

*The Building Permit*

■   By reason of the exemption contained in Public Resources Code sections 21169 and 21170, the building permits here involved are valid despite their issuance without the benefit of an environmental impact report.

California's Environmental Quality Act (Pub. Resources Code, § 21050 et seq.) was adopted in 1970. On November 6, 1972, our Supreme Court in *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247 [104 Cal. Rptr. 761, 502 P.2d 1049], held that an EIR was required as a condition precedent to the issuance of a building permit for a project having a substantial effect upon the environment. The Legislature responded to *Friends of Mammoth* with amendments to the Environmental Quality Act. Among the amendments were "grandfather" exemptions covering defined projects undertaken in the period from the enactment of the original statutory scheme until the time of its modification. Public Resources Code section 21169 provides: "Any project . . . approved on or before the effective date of this section [December 5, 1972] and the issuance by any public agency of any . . . permit . . . issued on or before the effective date of this section notwithstanding a failure to comply with this division [respecting environmental impact reports], if otherwise legal and valid, is hereby confirmed, validated and declared legally effective." Public Resources Code section 21170, subdivision (a), declares that section 21169 is inoperative as to any project ". . . the legality of which was being contested in a judicial proceeding in which . . . the pleadings, prior to [December 5, 1972], alleged facts constituting a cause of action . . . of, a violation of this division . . .; provided, however, that section 21169 shall operate to . . . validate . . . any project to which this subdivision applies if, prior to the commencement of judicial proceedings and in good faith and in reliance upon the issuance by a public agency of any . . . permit, . . . substantial construction has been performed and substantial liabilities for construction and necessary materials have been incurred."

Here the building permit in question was issued by City on September 29, 1972, prior to the effective date of section 21169. Appellants' lawsuit to set aside the permit for lack of an environmental impact report was filed October 13, 1972, also before the effective date of that section. Thus the statute validates the permit only if Builder "prior to [October 13, 1972] and in good faith and in reliance upon the issuance by [City] of [the building and demolition] permit[s] . . ." performed "substantial construction" and incurred "substantial liabilities for construction and necessary materials."

Appellants did not request findings of fact in the action by which they sought to set aside the building permits. We thus must imply all findings necessary to support the judgment, refusing relief to appellants if the implied findings are supported by substantial evidence. Here substantial evidence in the form of declarations and exhibits received in evidence without objection supports the implied finding that in good faith reliance upon the demolition and building permits, Builder expended and became obligated to expend approximately $400,000 for demolition of the existing apartment building and for excavation, both part of and necessary to the construction of the condominium project. That implied finding of expenditure and obligation for substantial sums satisfies the requirement of Public Resources Code section 21170 for application of the relief provisions of section 21169 despite the intervention of a lawsuit challenging the project.

Citing *County of Inyo* v. *Yorty,* 32 Cal.App.3d 795 [108 Cal.Rptr. 377]. appellants argue that construction of the condominium itself is separate from the demolition of the predecessor structure and excavation so as to require a separate permit supported by an environmental impact report. *Yorty,* however, does not deal with the grandfather exemptions provided in Public Resources Code sections 21169 and 21170 but rather with the applicability of the Environmental Quality Act to "Ongoing Projects" where " '[a] substantial portion of public funds allocated for the project have not been spent and it is still feasible to modify the project in such a way as to mitigate against potentially adverse environmental effects, . . .; or . . . [t]he responsible agency proposes a modification to the project plan, such that the project might have a new significant effect on the environment.' " (State Guidelines, § 15070, quoted in 32 Cal.App.3d at pp. 805-806.) In that context, *Yorty* holds that a program by which the City of Los Angeles greatly expanded its extraction of ground water from the Owens Valley was a new and continuing project requiring an EIR despite the proposition that Los Angeles had, for many years, operated two aqueduct systems from the valley to convey primarily surface run off and some ground water to its inhabitants. In the case at bench, unlike the situation in *Yorty,* we deal with the application of a very specific grandfather exemption to the requirement of an EIR in a situation where there was no change in the nature of the project for the construction of the condominium structure from the time that demolition of its predecessor building was undertaken and excavation for the new building commenced.

Appellants argue further that Builder did not act in good faith reliance upon the permits. That argument, in effect, asks us to reweigh questions

of credibility decided adversely to appellants in the proceedings leading to this appeal. There being substantial evidence from which Builder's good faith reliance can be inferred, the contention lacks merit.

We thus conclude that Public Resources Code sections 21169 and 21170 exempt Builder from the requirements of an EIR as a condition precedent to the issuance to it by City of the various building permits here involved.[1]

### Condominium Subdivision Map

■ Apparently not contesting the proposition that an environmental impact report was considered and acted upon by the advisory agency which, pursuant to law, originally approved the tentative subdivision map for the condominium and by the planning commission which denied their appeal, appellants contend that approval of the tentative map is nevertheless invalid because the city council failed to approve the EIR.

The requirement of an EIR is imposed upon "[a]ctivities involving the issuance to a person of [an] . . . entitlement for use [of property] . . ." (Pub. Resources Code, § 21065, subd. (c)) where the issuance is discretionary rather than ministerial (Pub. Resources Code, § 21080), and "may have a significant effect on the environment." (Pub. Resources Code, §§ 21151, 21100.) Approval of a tentative subdivision map is an entitlement to the use of property involving a discretionary act of the agency approving the map. (Pub. Resources Code, § 21080.)

The statutory scheme envisions the adoption of administrative guidelines establishing categorical classes of exemption from the EIR requirement of classes of projects determined not to have a significant effect upon the environment. (Pub. Resources Code, § 21084.) In private projects not included within the categorical classes of exemption, the scheme envisions the adoption of administrative procedures and rules ". . . for the evaluation of projects and the preparation of environmental impact reports . . . ." (Pub. Resources Code, § 21082.) Those procedures and rules have been enacted as State Guidelines in California Administrative Code, title 14, section 15000 et seq.

While "[d]ivision of existing multiple family rental units into condominiums" is one category of exempt projects (State Guidelines, § 15101,

---

[1]Because of our conclusion that the "grandfather" provisions exempt the permits from the requirement of an EIR, we do not reach Builder's alternative contention that in any event issuance of the permits was a ministerial rather than discretionary act and exempt from the EIR requirement for that reason.

subd. (k)), the division of a new structure into condominium units is not. Assuming that the distinction between the conversion of existing rental units into condominiums and the construction of new structures to be sold as condominium units is a valid one, the administrative rules for the evaluation of the project and the preparation and approval of an EIR respecting it apply. In that event, section 15080 of the State Guidelines requires an initial study by the "lead agency" to determine if it is possible that the "project" may have a significant effect upon the environment. "Project" is defined as ". . . the whole of an action, resulting in physical impact on the environment, directly or ultimately . . . ." (State Guidelines, § 15037, subd. (a).) "Lead agency" is defined as ". . . the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment" (Pub. Resources Code, § 21067), and ". . . the public agency which has the principal responsibility for preparing environmental documents . . ." (State Guidelines, § 15030).[2] If the lead agency determines that a project "would ordinarily be expected to have a significant effect on the environment, but which the Public Agency finds will have no significant effect on the environment due to circumstances peculiar to the specific project," it issues a "Negative Declaration." (State Guidelines, § 15083.) If the responsible agency finds after an initial study that "the project may have a significant effect upon the environment . . ." it must cause an EIR to be prepared. (State Guidelines, § 15084, subd. (a).) "The final EIR shall be presented to the decision-making body of the responsible agency. The decision-making body shall adopt the final EIR and consider the contents of the report when it makes a decision on the project." (State Guidelines, § 15085, subd. (f).) "To the extent possible, the EIR process should be combined with the existing planning, review, and project approval process being used by each responsible agency." (State Guidelines, § 15086.)

If the tentative subdivision map approval involved in the case at bench is a "project that would ordinarily have a significant effect on the environment," as that term of art is used in the Environmental Quality Act and the implementing regulations, it is questionable that the regulatory directives for consideration of an EIR have been satisfied since the city council, the governing board of the unit of government approving the tentative map, did not adopt or approve the EIR. (See State Guidelines, § 15085, subd. (f), as originally drafted and as amended in December 1973.) The peculiar

---

[2]The State Guidelines were amended without relevant change in substance after the trial of the case at bench.

situation created by the chronology of the case at bench, however, precludes consideration of that issue.

Builder, while cooperating in furnishing information necessary for the EIR, at all times denied that the report was a required condition precedent to approval of the tentative map. On the facts here, Builder is correct. An EIR is required in approval by a local agency of a private project only when the project would ordinarily have a significant effect upon the environment. (Pub. Resources Code, § 21151.) The regulations require an initial study by the responsible agency to determine that fact as a prerequisite to the need for an EIR. Here the record establishes conclusively that the responsible agency was required to find that the project, as project is defined in the code, could not have a significant effect on the environment.

The "project" here is the activity involving approval of the tentative map. (Pub. Resources Code, § 21065, subd. (c).) It is not the construction or occupancy of the 109-unit building, that construction and occupancy having been validated without the benefit of an EIR by Public Resources Code sections 21169 and 21170. The effect of the "project" thus extends no more broadly than the authorization for sale of dwelling units and shares of common areas that otherwise would be rented. There is no showing whatever that the authorization for sale, as contrasted with the construction and occupancy of the building, will in any way affect the environment. There is a very strong indication to the contrary.

" 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5.) The statutory directive for the adoption of administrative guidelines provides that criteria must be adopted to be followed by public agencies in determining whether or not a proposed project may have a significant effect upon the environment. (Pub. Resources Code, § 21083.) Those criteria must require a finding of significant effect if: "(a) A proposed project has the potential to degrade the quality of the environment, curtail the range of the environment, or to achieve short-term, to the disadvantage of long-term, environmental goals; (b) The possible effects of a project are individually limited but cumulatively considerable; (c) The environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (Pub. Resources Code, § 21083.) The State Guidelines (§ 15081) describes as examples of ". . . consequences which may have a significant effect on the environment . . ." a change that: ". . . (1) Is in conflict with environmental

plans and goals that have been adopted by the community where the project is to be located; (2) Has a substantial and demonstrable negative aesthetic effect; (3) Substantially affects a rare or endangered species of animal or plant, or habitat of such a species; (4) Causes substantial interference with the movement of any resident or migratory fish or wildlife species; (5) Breaches any published nation, state, or local standards relating to solid waste or litter control; (6) Results in a substantial detrimental effect on air or water quality, or on ambient noise levels for adjoining areas; (7) Involves the possibility of contaminating a public water supply system or adversely affecting ground water; (8) Could cause substantial flooding, erosion or siltation; (9) Is subject to major geologic hazards."

The record does not include the slightest showing that approval of the tentative subdivision map with the consequent permission to Builder to sell condominium units with concomitant shares in common areas will have any of the consequences described in the code or Guidelines. To the extent that the possibility of described consequences exists, that possibility is due to the construction and occupancy of the 109-unit building which are not within the definition of "project" which governs our decision.

Conversely, there is a very strong indication that the approval of the tentative map is not a "project" which involves the possibility of an adverse effect upon the environment. The State Guidelines (§ 15101, subd. (k)) establish as a category of activity exempt from the requirements of an EIR the "[d]ivision of existing multiple family rental units into condominiums; . . ." Where, as here, the structure is a new one but its construction is authorized without the requirement of an EIR because of the grandfather provisions of the Environmental Quality Act, the approval of a tentative subdivision map permitting the sale of condominiums in the structure is the essential equivalent of conversion of existing multiple rental units into condominiums. In both situations, the impact upon the environment is the same. Impact, if any, must be found in the change of status of the occupants of the structure from tenants to owners. The administrative determination, pursuant to express statutory authority, that the change in status of occupancy has no effect upon the environment in the case of existing dwelling units, compels a conclusion that governmental action permitting sale and hence occupancy by owners rather than tenants in the first instance equally has no effect, absent something in the record to the contrary. Here nothing to the contrary appears.

In their reply brief, appellants first raise the issue that the advisory agency and the appeals board failed to give due consideration to the EIR because

there is no response describing the disposition of significant environmental issues raised in the report. (See *People* v. *County of Kern*, 39 Cal.App.3d 830, 841 [115 Cal.Rptr. 67].) In view of our conclusion that no EIR was required, we do not consider either the timeliness or merit of the contention.

### Purported Misrepresentation of Zoning

█ Appellants contend that the entire proceeding leading to approval of the tentative subdivision map and the disallowance of their petitions for writs of mandate in the trial court was infected by a misrepresentation by Builder that all of the Property was in an R-4 zone. In fact, a triangular sliver of approximately 1,900 square feet located at the northeast corner of the 1.85 acres was zone R-1. That fact, however, falls far short of establishing either misrepresentation or mistake fatally infecting the proceedings. The nature of the zoning of the sliver was known administratively and in the trial court. The issue was not the zoning classification of the sliver but rather its legal effect, particularly whether the R-1 sliver might be used to satisfy a side yard setback requirement for the R-4 construction. That issue remained open administratively at the time the judgments denying appellants' two petitions for writ of mandate to overturn the building permit and tentative map approval were entered. It is thus not before us here.

### Disposition

The judgments are affirmed.

Wood, P. J., and Hanson, J., concurred.

A petition for a rehearing was denied November 18, 1974, and appellants' petition for a hearing by the Supreme Court was denied December 26, 1974. Mosk, J., was of the opinion that the petition should be granted.