[Civ. No. 33766. First Dist., Div. Four. June 13, 1975.]

ENVIRONMENTAL LAW FUND, INC., et al.,
Plaintiffs and Respondents, v.
TOWN OF CORTE MADERA et al., Defendants and Appellants;
HARTER-ODENTHAL INVESTMENT COMPANY et al.,
Real Parties in Interest and Appellants.

**COUNSEL**

Bagshaw, Martinelli, Corrigan & Jordan and Leland H. Jordan for Real Parties in Interest and Appellants.

No appearance for Defendants and Appellants.

Carrow, Jones, Applen & Forest, Joseph A. Forest and Paul Kayfetz for Plaintiffs and Respondents.

## OPINION

**RATTIGAN, J.**—Respondents Environmental Law Fund, Inc., Marilyn L. Hallin and Larry Weingarth commenced this action, in which they sought relief in administrative mandamus and a declaratory judgment, to challenge (1) the validity of a conditional use permit issued by the planning commission of defendant-appellant Town of Corte Madera (to which we hereinafter refer on occasion as the "Town")[1] to real parties in interest-appellants Harter-Odenthal Investment Company, Bix Land Corporation, Composite Structures, Inc., and Cal-West Communities, Inc. (the "developers"); and (2) the validity of a tentative subdivision map, of the area affected by the permit, as approved by the commission upon the developers' application.[2]

In the judgment from which the appeal is taken, the trial court ordered that the grant of the conditional use permit, as authorized by the Corte Madera Municipal Code, violated the provisions of Government Code section 65853 which establish procedures for changes in zoning, and that the procedures authorized in the municipal code for such purpose were invalid because they conflicted with the state zoning law. The court also ordered the Town to rescind its actions relative to the conditional use permit and the tentative subdivision map, and to refrain from approving a tentative subdivision map until an environmental impact report was prepared and submitted in compliance with the Environmental Quality Act of 1970.

The developers are the owners of approximately 75 acres of land (hereinafter "the property") in the Town of Corte Madera. In 1963 the

---

[1] On September 6, 1973, the appeal of the Town (only) was dismissed at its request.

[2] In the initial pleading ("Petition For Writ of Mandate And Declaratory Judgment"), it was alleged that respondent Environmental Law Fund, Inc., was "a non-profit corporation . . . established to safeguard the physical environment, particularly in Marin and Sonoma Counties . . . ." It was further alleged that respondents Hallin and Weingarth are "residents . . . of the Town of Corte Madera, and their residences are situated less than one mile from the real property" affected by the conditional use permit and the tentative subdivision map. The facts thus alleged are undisputed.

Town adopted a general plan. Although at the time of adoption of this 1963 general plan the property was outside the corporate boundaries of the Town, the general plan extended to areas outside such corporate limits.

In 1971, the developers applied to the Town to "prezone" the property to R-2, multiple residential zoning. On April 19, 1971, the Town, pursuant to Government Code section 65859, prezoned the property to the R-2 classification and also amended the 1963 general plan to classify the property in this fashion. On August 5, 1971, the property was annexed to the Town.

Prior to the prezoning of the property and the annexation of the property to the Town, the Corte Madera zoning administrator, in a letter dated April 5, 1971, recommended to the Town planning commission that, due to the potential impact of the proposed large development, a careful study by a qualified firm of planning consultants should be undertaken. Pursuant to this recommendation, the Town retained the private planning consulting firm of Sedway-Cooke, and required the developers to pay the Town $12,600 for the expense of the study. The final Sedway-Cooke report was presented in February 1972.

On January 10, 1972, apparently after at least two public hearings on the matter, the Corte Madera planning commission granted the conditional use permit for the planned unit development proposed by the developers.

On April 26, 1972, a tentative subdivision map was approved by the planning commission.

On May 19, 1972, a grading permit was issued by the director of public works of the Town after approval by the Town council, and grading commenced for the development.

The actions of the planning commission in granting the conditional use permit for the planned unit development, and in approving the tentative subdivision map, were not appealed to the Town council, although the Town ordinances permitted such appeal.

As the court below found, and appellants concede, in certain respects, the approved tentative subdivision map did not conform to the R-2, multiple residential district zoning requirements of the Corte Madera municipal code.

Following the approval of the conditional use permit for the planned unit development, and of the tentative subdivision map, and up to the time the developers were made parties to the proceedings below, the developers spent between $10,000 and $15,000 on actual improvements to the property.

## I

Section 18.58.030 of the Corte Madera Municipal Code provides, generally, for an appeal to the town council from any action taken by the planning commission. Section 18.46.070 specifically provides for an appeal to the council from action taken by the planning commission upon an application for a conditional use permit. Section 18.46.070, with which section 18.58.030 is substantially identical in pertinent terms, states: "Within ten days following the date of a decision of the planning commission . . . , the decision may be appealed to the town council by the applicant *or by any other interested party.*" (Italics added.)

No appeal was taken to the town council, by any person at any time, from the action by which the planning commission issued the conditional use permit on January 10, 1972. For this reason, appellants contend that respondents have at all times been barred from seeking the relief which the trial court granted as to the permit, and that the trial court was without jurisdiction to grant such relief, because respondents failed to exhaust their administrative remedies.

The doctrine of exhaustion of administrative remedies is well settled: it is commonly held that if an administrative remedy is provided by statute or ordinance, a litigant must show that he invoked and exhausted the remedy before he may obtain judicial review of the administrative action taken. (See, e.g., *Ralph's Chrysler-Plymouth* v. *New Car Dealers Policy & Appeals Bd.* (1973) 8 Cal.3d 792, 794 [106 Cal.Rptr. 169, 505 P.2d 1009]; *Temescal Water Co.* v. *Dept. Public Works* (1955) 44 Cal.2d 90, 106 [280 P.2d 1].) It is also true that his exhaustion of the administrative remedy is ordinarily treated as a jurisdictional prerequisite, not as a matter of judicial discretion. (See, e.g., *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942, 132 A.L.R. 715]; *Morton* v. *Superior Court* (1970) 9 Cal.App.3d 977, 981 [88 Cal.Rptr. 533]; 1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, § 64, p. 587. See, generally, 2 Witkin, *op. cit.,* Actions, § 181, pp. 1045-1046; Reed, *Exhaustion of Administrative Remedies in California* (1968) 56 Cal.L.Rev. 1061.)

The exhaustion doctrine is frequently applied to bar the pursuit of a judicial remedy by a person to whom administrative action was available for the purpose of enforcing the right he seeks to assert in court, but who has failed to commence such action and is attempting to obtain judicial redress where no administrative proceeding has occurred at all. (See, e.g., *In re Walker* (1948) 32 Cal.2d 488, 489-491 [196 P.2d 882]; *Morton* v. *Superior Court, supra,* 9 Cal.App.3d 977 at pp. 981-982.) The doctrine is more commonly applied as a complete defense to litigation commenced by persons who have been aggrieved by action taken in an administrative proceeding which has occurred in fact, but who have failed to "exhaust" the remedy against such action which is available to them in the course of the proceeding itself. (See, e.g., *Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d 280 at p. 283; *Ralph's Chrysler-Plymouth* v. *New Car Dealers Policy & Appeals Bd., supra,* 8 Cal.3d 792 at pp. 793-794.)

Typically, or invariably, in the latter category of cases (of which this is one, an administrative proceeding having actually taken place before the planning commission), the person seeking to exercise a judicial remedy has been a party to the administrative proceeding involved—either as an individual or as a member of a limited group of persons identically situated—and the administrative action of which he complains in court has adversely affected a right or rights held personally and exclusively by himself or in common with other members of the group. (See, e.g., *Ralph's Chrysler-Plymouth* v. *New Car Dealers Policy & Appeals Bd., supra,* 8 Cal.3d 792 at pp. 793-794 [individual automobile dealer subjected to disciplinary accusation]; *Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d 280 at p. 283 [employer group ordered to pay unemployment benefits: for a full analysis of the *Abelleira* facts, see Reed, *op. cit. supra,* 56 Cal.L.Rev. 1061 at pp. 1065-1066]; *Horack* v. *Franchise Tax Board* (1971) 18 Cal.App.3d 363, 366 [95 Cal.Rptr. 717] [three taxpayers seeking refund of personal income taxes]. See, generally, cases cited in 2 Cal.Jur.3d, Administrative Law, § 262, p. 506 [fn. 85].)

Where the exhaustion doctrine is applied to foreclose such persons from proceeding judicially, they incur the consequences of their own default; the rights of which they are denied enforcement in the judicial process are rights which they claim to hold personally or with a limited number of others identically situated; they who have defaulted as private persons are the only losers, and their private rights alone are lost. Application of the doctrine against them is therefore consonant with such familiar principles as waiver and res judicata, and the interests of justice are not disserved.

 In the present case appellant developers, as the applicants, were the titular "parties" to the administrative proceeding in which the permit was issued by the planning commission. The permit was issued after at least two public hearings by the commission. The minutes of these hearings, which are in the record, show that numerous named persons appeared at the hearings and protested the proposed permit or otherwise made their views known to the commission. It does not appear that any of the respondents were among these persons, nor that any of them had notice of the proceeding.[3] The developers were thus "parties" but, so far as appears, respondents were not.

Witkin states the exhaustion doctrine as holding that "[b]efore *a party* may obtain judicial review of . . . an administrative board or officer, he must first apply to such board or officer for relief, and the courts will not act until he has exhausted his administrative remedy." (Italics added.) (1 Witkin, Cal. Procedure, *op. cit. supra,* Jurisdiction, § 64, p. 587.) Although the literal terms of this language might be construed as suggesting that the doctrine will not bar the exercise of a judicial remedy, against administrative action, by one who was not "a party" to the administrative proceeding which produced it, we are aware of no decision, in California or other jurisdictions, which so holds.[4] Absent such authority, it would appear that the doctrine could and should be applied to bar such person from judicial relief so long as it involves no more than private default in the exercise of privately held rights and is, therefore, in harmony with the aforementioned principles of waiver and res judicata.

Application of the doctrine against these respondents, however, would involve substantially more. Because they have exercised a judicial

---

[3]Section 18.46.040 of the Corte Madera Municipal Code requires that notice of a hearing by the planning commission, upon any application for a conditional use permit, be given by mail to "all persons . . . owning real property within a distance of not less than three hundred feet from the exterior boundaries of the area that is the subject of the hearing." There is no evidence that any of the respondents were among such property owners, or that notice of the hearings conducted was given to any of them in any form.

[4]Having examined all or most of the innumerable cases dealing with the exhaustion doctrine, and various authorities which discuss it, we have found none on the question whether judicial review of administrative action is barred when sought by a person who did not pursue an administrative remedy in a proceeding to which he was not a party. (See, e.g., cases cited in 2 Cal.Jur.3d, Administrative Law, § 262, p. 506 [fn. 85]; 2 Cooper, State Administrative Law (1965) pp. 572-585; 3 Davis, Administrative Law Treatise (1958) §§ 20.01-20.10; Jaffe, Judicial Control of Administrative Action (1965) pp. 424-458; Berger, *Exhaustion of Administrative Remedies* (1939) 48 Yale L.J. 981; Stason, *Timing of Judicial Redress From Erroneous Administrative Action* (1941) 25 Minn.L.Rev. 560; Comments, *Exhaustion of Administrative Remedies* (1954) 39 Cornell L.Q. 273.)

remedy against administrative action which they claimed to have been in violation of state law (and which the trial court properly held to have been in violation of law as claimed), and because the administrative action affected the entire Town, respondents have asserted rights which they hold as members of the public or which respondents Hallin and Weingarth, at least, hold as members of that substantial segment of the public which includes residents and property owners of the Town. (See fn. 2, *ante.*)

Respondents are thus pursuing more than privately held rights, and are asserting more than privately held grievances: they are acting as members of the public and in the public interest. Application of the exhaustion doctrine against them, by reason of their "default" in the administrative proceeding to which they were not "parties" at all, would mean in effect the imputation of their "default" to the public in the absence of any factual basis for such imputation. In general, the doctrine would thus operate to bar the public from redressing a public wrong; specifically, it would burden the public of the Town, in perpetuity, with the illegal zoning of a substantial area of the community by insulating the zoning action from judicial review.

This result would not be consistent with principles of waiver or res judicata, and it would totally disserve the public interest. **(3)** For these reasons, we hold that the failure of a private person to exhaust an administrative remedy, against governmental action taken in an administrative proceeding to which he was not a party, does not bar him from seeking judicial relief from such action by way of enforcing rights which he holds as a member of the affected public.

II

■ As to the application of the exhaustion doctrine with respect to the planning commission's approval of the tentative subdivision map, the trial court concluded that respondents had "done all that is required of them in pursuing their administrative remedies before attacking the subdivision map in court."

In *Friends of Lake Arrowhead* v. *Board of Supervisors* (1974) 38 Cal.App.3d 497, 503-508 [113 Cal.Rptr. 539], the appellate court considered the question of the validity of local procedures which were arguably designed to provide a right of administrative appeal to persons, other than subdividers, from decisions of planning commissions approv-

ing tentative tract maps. The court concluded that such local procedures were in conflict with, and preempted by, applicable state law, and therefore provided no administrative remedy.

The court in *Friends of Lake Arrowhead* was considering a portion of the San Bernardino County Code similar in import to the general appeal section of the Corte Madera Municipal Ordinance noted above. The court compared the provisions of Business and Professions Code section 11552, subdivision (b) (providing a right of appeal *only to the subdivider* from advisory agency actions on tentative maps) with those of section 11552.2 (added in 1972, providing such an appeal right to "any person affected" by a subdivision decision "rather than only the subdivider" in cities with population in excess of 2,800,000) and newly enacted subdivision (c) of section 11552 (effective Jan. 1, 1975, allowing local agencies to adopt ordinances permitting "any interested person adversely affected" to "file a complaint with the governing body 'concerning any decision of the advisory agency or appeal board' "). The court concluded that "the Legislature intended Business and Professions Code section 11552 to be the exclusive regulation on the subject of appeals from advisory agency decisions on tentative tract maps." (*Id.,* at p. 507.)

Thus, "a local ordinance extending the right of appeal to any interested person would be inconsistent" with the preemptive state law, and the general appeals section of the ordinance must be construed not to provide such a right. (*Id.,* at p. 508.) Insofar as the tentative subdivision map was concerned, therefore, respondents herein had no available administrative remedy, and the petition below was properly considered by the trial court.

### III

■ Respondents challenged the Town's approval of both the conditional use permit and the tentative subdivision map on the ground that appellants had allegedly failed to prepare and submit an environmental impact report (EIR) as required by the California Environmental Quality Act of 1970 (CEQA; Pub. Resources Code, § 21000 et seq.). As to the conditional use permit, respondents are precluded from asserting in court any alleged noncompliance with the CEQA as they failed to exhaust their administrative remedies. (*Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors* (1974) 38 Cal.App.3d 257, 266 [113 Cal.Rptr. 328].)

After reciting the authority of courts to review the sufficiency of an EIR (*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695 [104 Cal.Rptr. 197]), the court below concluded that: "4. The tentative map for Madera del Presidio, Unit No. 1, is invalid, as an environmental impact report was required to have been prepared and submitted in accordance with the provisions of the Environmental Quality Act of the State of California, and such report was not so prepared and submitted. 5. The Sedway Cooke report for the subject planned unit development does not constitute a valid environmental impact report."

Appellants do not argue that approval of the tentative subdivision map is not a project for which the CEQA ordinarily requires an environmental impact report (Pub. Resources Code, §§ 21100, 21151; cf. Pub. Resources Code, §§ 21065, subd. (c), 21080, subd. (a) (effective Dec. 5, 1972); *Pacific Palisades Property Owners Assn.* v. *City of Los Angeles* (1974) 42 Cal.App.3d 781 [117 Cal.Rptr. 138]; *Friends of Lake Arrowhead* v. *Board of Supervisors, supra,* 38 Cal.App.3d at pp. 507-508). Rather, appellants contend that the tentative subdivision map is valid either because (1) the Sedway-Cooke project report constituted both literal and substantial compliance with the CEQA requirements; or (2) the map was validated by the 1972 urgency amendment to CEQA (§§ 21169-21170, effective Dec. 5, 1972). Appellants further urge that if the map was not so validated by the 1972 urgency amendment, Public Resources Code section 21170, insofar as it distinguishes between projects which were subject to litigation and projects which were not, is unconstitutional.

The Sedway-Cooke report is a 25-page document, with 15 pages of appendices. Appellants expended $12,600 on the study, which was prepared at the suggestion of the Corte Madera zoning administrator and the requirement of the Town planning commission.

The report must be measured against the mandates of Public Resources Code section 21100 (as originally enacted), which requires a *detailed statement* setting forth the following: "(a) The environmental impact of the proposed action. (b) Any adverse environmental effects which cannot be avoided if the proposal is implemented. (c) Mitigation measures proposed to minimize the impact. (d) Alternatives to the proposed action. (e) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity. (f) Any irreversible environmental changes which would be involved in the proposed action should it be implemented." Appellants'

ingenious attempt to find compliance with these elements within the "four corners" of the Sedway-Cooke report falls short. Although the planning consultants obviously considered certain specific items that might be said to fall within the scope of an EIR, appellants virtually concede that subdivisions (d), (e) and (f) of the statute have not been discussed at all. Numerous other factors essential to an adequate EIR in this case have either been briefly noted or thoroughly neglected.

Literal compliance with the provisions of CEQA was thus obviously not present. The Sedway-Cooke report does not purport to expressly analyze *any* of the enumerated elements of Public Resources Code section 21100. Indeed, it was admittedly not prepared with the provisions of CEQA in mind (like numerous other private projects prior to *Friends of Mammoth*). Appellants have had to attempt to pull together scattered paragraphs from the report to show even partial compliance.

It may be true, as appellants argue, that the environmental impact report need not discuss and analyze the elements in section 21100 in the *precise order* that they are contained in the statute. Furthermore, whether substantial rather than literal compliance would satisfy CEQA requirements was left undecided by the Supreme Court in *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, page 263, fn. 8 [104 Cal.Rptr. 761, 502 P.2d 1049], and appears not to have yet been determined by any California appellate court. However, even assuming arguendo that *substantial* compliance would suffice (an argument perhaps bolstered by decisions under certain analogous provisions of the National Environmental Policy Act of 1969 (*Friends of Mammoth, supra,* 8 Cal.3d at pp. 260-261; *Environmental Defense Fund, supra,* 27 Cal.App.3d at p. 701)), it was not achieved here.

Although the court below acknowledged the apparent public exposure that the Sedway-Cooke study received, its decision that the report was nonetheless inadequate was based on the conclusion that "it does not accomplish the purposes sought to be achieved by the report provided for in the act." In view of the explicit legislative intent of CEQA (Pub. Resources Code, § 21000), the broad reemphasis of that goal in later legislative and judicial actions involving CEQA, and the deficiencies in the Sedway-Cooke report noted above, the trial court's conclusion was correct. "[T]he EIR must fulfill the role of disclosure of qualified estimations of the best way, all things considered, of meeting the demands of the present while preserving and, if possible, enlarging an ample inheritance for the future. The impact report provides evidence

that the decision making has in fact been made and it allows those who are removed from the initial process to evaluate and balance the reported factors in their own judgment." (*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist., supra,* 27 Cal.App.3d at p. 705.)

The court below was correct in its conclusion that the environmental impact report requirements of CEQA were neither literally nor substantially complied with.

IV

■ The tentative subdivision map is not validated by Public Resources Code sections 21169 and 21170.

As part of the 1972 urgency amendment to CEQA, the Legislature enacted Public Resources Code sections 21169 and 21170, validating certain private projects carried out or approved on or before December 5, 1972, the effective date of the sections. It is clear that the petition for writ of mandamus (filed on May 25, 1972, with judgment entered on Mar. 23, 1973), put the case squarely within section 21170, subdivision (a), which denies the legislative grace of section 21169 to "any project the legality of which was being contested in a judicial proceeding in which proceeding the pleadings, prior to . . . [Dec. 5, 1972] . . . , alleged facts constituting a cause of action for, or raised the issue of, a violation of this division and which was pending and undetermined on . . . [Dec. 5, 1972] . . . ."

However, appellants seek refuge in the remaining language of section 21170, subdivision (a), which provides that "Section 21169 shall operate to confirm, validate or give legal effect to any project to which this subdivision applies if, prior to the commencement of judicial proceedings and in good faith and in reliance upon the issuance by a public agency of any lease, permit, license, certificate or other entitlement for use, substantial construction has been performed and substantial liabilities for construction and necessary materials have been incurred." They allege the good faith expenditure of $10,000-$15,000 in actual on-site construction, and incurrence of a substantial liability in the form of a grading contract, in the sum of $70,000, for construction of the project.

Insofar as the case was heard and submitted prior to the enactment of the urgency amendments to CEQA, the trial judge made no findings as to the appellants' alleged expenditures and contract. It is clear that the

only relevant expenses are those occurring after April 26, 1972 (the date of approval of the tentative subdivision map) and prior to May 31, 1972 (the date the developers were served with notice of the petition herein), for only those expenses could be said to be "in good faith and in reliance on" the issuance of the challenged subdivision map. (Cf. *Concerned Citizens of Palm Desert, Inc.* v. *Board of Supervisors* (1974) 38 Cal.App.3d 272, 282-283 [113 Cal.Rptr. 338].)

The precise amounts expended during the specified time period are unclear. Two lists of expenditures were admitted into evidence. From the testimony of witnesses, it appears that a very substantial portion of the on-site construction expenses were incurred *prior to* April 26, 1972, and, although some work was actually commenced and some payment made under the grading contracts, all after April 26, Mr. Warneck, a witness for the developers, testified that the contracts were "negotiated and agreed to" but not "reduced to signed written documents" by May 24.

Although some appellate courts have already provided relief under the "substantial construction" and "substantial liabilities" proviso of section 21170, these decisions have involved much larger sums of money than appellants have expended in the present case, even were we to imply findings of fact most favorably to them (*Pacific Palisades Property Owners Assn.* v. *City of Los Angeles, supra,* 42 Cal.App.3d 781, at p. 788 ($400,000); *Friends of Lake Arrowhead, supra,* 38 Cal.App.3d 497, at pp. 509-510 ($900,000)). Further, as appellants did not request findings of fact below as to the amounts expended, we must imply all findings necessary to support the judgment below, and refuse relief to appellants if the implied findings are supported by substantial evidence (*Pacific Palisades Property Owners Assn., supra,* at pp. 787-788).

It is thus apparent that, on the record before us, appellants' expenditures do not constitute the "substantial" sums referred to in section 21170, and the tentative subdivision map was not validated by the proviso in that section. (Cf. *Concerned Citizens of Palm Desert, Inc., supra,* 38 Cal.App.3d 272, 282.) Therefore, the conclusion of the court below that the tentative subdivision map be revoked, and that the Town not issue another such map until an EIR is filed in compliance with CEQA, was proper. In view of this holding, it is unnecessary to discuss respondents' other contentions concerning the invalidity of the subdivision map.

## V

█ Appellants urge that Public Resources Code section 21170, insofar as it attempts to distinguish between projects which were subject to litigation and projects which were not (prior to the effective date of the section, Dec. 5, 1972) is invalid and unconstitutional. The alleged grounds of invalidity and unconstitutionality are that the distinction bears no rational relationship to the purposes of the Environmental Quality Act, and is in fact patently unreasonable and arbitrary.

This precise allegation was carefully considered and rejected in the recent opinion in *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1974) 44 Cal.App.3d 158 [118 Cal.Rptr. 490]. The court therein discussed the obvious dilemma confronting the Legislature in "the competing interests of the project entrepreneur in protecting his invest-ment and the interest of neighbors and others in protecting their environment." (*Id.,* at p. 164.) In attempting to achieve an equitable balancing of these interests, the Legislature reasonably determined "that where projects were undertaken in good faith and without being legally challenged in a court of law, principles of fairness require authority to complete the project." (*Id.,* at p. 164.)

We must agree with the court in *Russian Hill Improvement Assn.* that section 21170, subdivision (a) is substantially related to the purpose for which the urgency amendments to CEQA were enacted: "to avoid hardship and unfairness which would be caused by a retroactive application of CEQA to projects undertaken in good faith, but under an erroneous interpretation of the law." (*Id.,* at p. 163.)

The judgment is affirmed.

Christian, J., concurred.

**CALDECOTT, P. J.**—I concur in parts II, III, IV and V of the majority opinion but dissent as to part I.

The majority concede that the rule is well established that if an administrative remedy is provided by statute (or ordinance) a litigant must invoke and exhaust such remedy before relief of mandamus under section 1094.5 of the Code of Civil Procedure is available. (*Ralph's Chrysler-Plymouth* v. *New Car Dealer's Policy & Appeals Bd.* (1973) 8 Cal.3d 792 [106 Cal.Rptr. 169, 505 P.2d 1009]; *Temescal Water Co.* v.

*Dept. Public Works* (1955) 44 Cal.2d 90 [280 P.2d 1].) Exhaustion of petitioner's administrative remedies is a jurisdictional prerequisite, not a matter of judicial discretion. (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 293 [109 P.2d 942, 132 A.L.R. 715]; *Morton* v. *Superior Court* (1970) 9 Cal.App.3d 977, 981 [88 Cal.Rptr. 533].)

"[E]ven where the statute sought to be applied and enforced by the administrative agency is challenged upon constitutional grounds, completion of the administrative remedy has been held to be a prerequisite to equitable relief." (*United States* v. *Superior Court* (1941) 19 Cal.2d 189, 195 [120 P.2d 26]; *Smith* v. *City of Duarte* (1964) 228 Cal.App.2d 267, 269 [39 Cal.Rptr. 524]; *People* v. *Coit Ranch, Inc.* (1962) 204 Cal.App.2d 52, 57-59 [21 Cal.Rptr. 875]; *Dunham* v. *City of Westminster* (1962) 202 Cal.App.2d 245, 249 [20 Cal.Rptr. 772]; *Tushner* v. *Griesinger* (1959) 171 Cal.App.2d 599, 608 [341 P.2d 416].) As stated by the court in *United States* v. *Superior Court, supra,* at pages 194-195: "The respondents apparently contend that the requirement of exhaustion of administrative remedies applies only to erroneous orders and does not preclude judicial interference where, as here, an order is assailed as a nullity because illegally adopted. . . . But there is no substantial difference, insofar as the necessity for resort to administrative review is concerned, between an erroneous order and one which, it is claimed, is being executed in violation of statutory authority."

As the Supreme Court said in *Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d 280 at page 293: "The rule itself is settled with scarcely any conflict. It is not a matter of judicial discretion, but is a fundamental rule of procedure laid down by courts of last resort, followed under the doctrine of *stare decisis,* and binding upon all courts. We are here asked to sanction its violation, either on the ground that a valid exception to the rule is applicable, or that despite the uniformity with which the rule has been applied, it may be disregarded by lower tribunals without fear of prevention by the higher courts. This last point cannot be too strongly emphasized, for the rule will disappear unless this court is prepared to enforce it."

The fact that the time limit for the administrative appeal is now past, or even that such time limit had expired when the petition for writ of mandamus was filed below, so that the administrative remedy provided by the municipal code was no longer available, does not alter the application of the exhaustion doctrine. To hold otherwise would obviously permit parties to easily circumvent the entire judicial policy

behind the doctrine. (*Alexander* v. *State Personnel Bd.* (1943) 22 Cal.2d 198 [137 P.2d 433]; cf. *Humbert* v. *Castro Valley County Fire Protection Dist.* (1963) 214 Cal.App.2d 1 [29 Cal.Rptr. 158].)

The majority would create an exception to the doctrine and hold that the failure of a private person to exhaust an administrative remedy, against government action taken in an administrative proceeding to which he was not a party does not bar him from seeking judicial relief from such action by way of enforcing rights which he holds as a member of the affected public.

The majority state that the requirement of exhaustion of administrative remedies would operate to bar the public from redressing a public wrong by insulating the zoning action from judicial review. The doctrine does not bar the public from judicial review, it merely provides the procedural steps to be taken and judicial review is one of the steps available. The fact that in the exercise of these rights there are preliminary steps prior to judicial review does not mean that the public is deprived of any rights.

A party to an administrative proceeding also has rights as do persons whose property is affected by the administrative action. But, as discussed above, these persons must, in the exercise of their rights, follow the procedure of first exhausting their administrative remedy before resorting to the courts. This has been found to be a reasonable and lawful condition as well as a practical one. The majority cite no cases or authority in support of their proposal and give no reason why persons who are only indirectly concerned with an administrative action should be given greater rights than those directly affected.

Furthermore, there is no evidence that the respondents were acting on behalf of the public. There is an allegation in the petition that the respondents were acting in the public interest and that the respondent corporation was established to safeguard the physical environment. This allegation, however, was denied in the answer. No evidence was offered on the issue and no finding of fact was made concerning it. Actually, this issue was never before the trial court and neither the trial nor the appeal was based on this theory. Thus, if there is such an exception to the doctrine of exhaustion of administrative remedies, on the facts of this case, it would not be applicable.

Furthermore, there is no evidence that the respondents did not have knowledge of the proceedings relative to the subject property. In fact, the petition alleges that the two individual respondents were present at some of the administrative hearings. No excuse appears in the record as to why the respondents (at least the individuals) could not have pursued their administrative remedy.

The practical effect of this proposal would be to destroy the doctrine of exhaustion of administrative remedies and throw these cases directly into the courts. The proposed exception would not be workable.

I would reverse that portion of the judgment declaring invalid the procedure for approval of the planned unit development and that portion of the judgment granting a peremptory writ of mandate as to the conditional use permit.