[L.A. No. 30977, Apr. 10, 1979.]

SAN DIEGO TEACHERS ASSOCIATION et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent.

COUNSEL

Howard J. Bechefsky, Christopher J. Schatz, Sheela, Lightner, Castro & Walsh, Sheela, Lightner & Castro, Peter T. Galiano and Raymond L. Hansen for Petitioners.

Geffner & Satzman, Jeff Paule and Leo Geffner as Amici Curiae on behalf of Petitioners.

Donald L. Clark, County Counsel, Betty Evans Boone, Chief Deputy County Counsel, and Robert C. Campbell, Deputy County Counsel, for Respondent.

Paul M. Loya, Paterson & Taggart, Silvia M. Diaz, Kristin A. Jensen, W. Craig Biddle, Robert G. Walters, John L. Bukey, Biddle, Walters & Bukey, O'Melveny & Myers, Richard N. Fisher, Gordon E. Krischer and Kenneth S. Stewart as Amici Curiae on behalf of Respondent.

OPINION

NEWMAN, J.—In this writ of review proceeding San Diego Teachers Association (SDTA) and Hugh Boyle seek annulment of contempt orders that punish them for conducting a strike against the San Diego Unified School District in violation of a restraining order and a preliminary injunction. Boyle was SDTA's president during events that led to the contempt orders. The strikers' demands arose out of negotiations being conducted on behalf of the district's teachers. SDTA was the exclusive representative under the Education Employment Relations Act (EERA), Government Code sections 3540-3549.3[1] When the injunction was issued both SDTA and the district had filed unfair practice charges against each other (§ 3541.5) with the then Educational Employment Relations Board (since Jan. 1, 1978, called the Public Employment Relations Board, herein referred to as PERB). No PERB hearing or other action had ensued.

The main issue is whether the restraining order and injunction are invalid because the district failed to exhaust its EERA remedies. SDTA's unfair practice charge was filed with PERB on May 19, 1977, and alleged

---

[1]References are to the Government Code unless otherwise indicated. Designation of exclusive bargaining agents is provided by sections 3544-3544.9.

that the district had refused to discuss certain matters affecting employment and thus had violated section 3543.5, subdivision (c), by "fail[ing] to meet and negotiate in good faith." The district alleged in its charge, filed May 27, that SDTA's own failure to meet and negotiate in good faith (§ 3543.6, subd. (c)) was evidenced by its sponsoring work slowdowns and threatening a strike if not contract were negotiated by June 6. The district also alleged that there had been eight 7-hour negotiating sessions since May 11 and that neither party invoked the impasse procedures of sections 3548-3548.4.

On June 2 the district filed with respondent court a complaint asking that SDTA and its officers be enjoined from conducting a strike. The complaint alleged not only that the strike would be illegal and cause the district and pupils irreparable injury but also that under the EERA the parties had duties to meet and negotiate and had not declared an impasse.

A strike began on June 6; and that day, at the district's request, respondent court issued a restraining order. The application for a preliminary injunction was heard on June 7; the injunction issued on June 8. On June 9 SDTA announced termination of the strike after receiving assurances that the district would negotiate certain issues and not take reprisals against striking teachers.

On June 14 Judge Levitt, who had signed the preliminary injunction, filed a declaration alleging violation of the restraining order and injunction by SDTA and Boyle, and they were ordered to show cause why they should not be held in contempt. Judge Levitt acted on his own motion; the district did not participate in the contempt proceeding and is not now before us.

After trial SDTA was found guilty of three violations of paragraph 5 of the restraining order and six violations of paragraphs 1 and 2 of the injunction and was fined $500 for each violation. Boyle was convicted of three violations of paragraph 5 of the restraining order and five violations of paragraph 2 of the injunction, was fined $4,000, and was sentenced to forty days in jail of which thirty were suspended.

Paragraph 5 of the restraining order enjoined "doing any act either direct or indirect in furtherance of [the] strike. Ordering, coercing, requesting, or otherwise inducing or attempting to induce an employee of [the district] to refrain from performing his employment duties for the [district] as part of a work stoppage, walk out, strike against [the district]."

The contempt order specifies violations by SDTA and Boyle as follows: (1) Boyle's announcement on June 6 that the SDTA board had voted to continue the strike notwithstanding the restraining order, (2) a press release of June 7 declaring that "the strike is not illegal." and (3) Boyle's announcement to a mass rally on June 7 that the strike would continue on June 8.

Paragraph 1 of the injunction forbade "[e]ngaging in a work stoppage or strike against the [district], its officers, agents, employees, and the children who attend school within the [district]." SDTA was convicted of having engaged in the strike on June 8 and 9.

Paragraph 2 of the injunction was essentially the same as paragraph 5 of the restraining order.[2] SDTA and Boyle were found guilty of (1) adopting on June 8 a board resolution (a) to continue the strike until the district promised no reprisals and "a return to good-faith bargaining," and (b) to urge parents to keep children away from school; (2) Boyle's speech later that day to a mass rally (a) reporting the resolution and the preliminary injunction, (b) arguing that judges do not make laws and the Legislature has made no law against public employee strikes, and (c) calling for continuation of the strike with Ben Franklin's exhortation to hang together or "surely we will hang separately"; (3) announcing to the media on June 9 that a condition to ending the strike would be a "no reprisals" guarantee; and (4) demanding such a guarantee at the district's board meeting on June 9. A violation by Boyle alone was based on a TV interview he gave on June 8 in which he stated that the strike would be honored by the district's bus drivers, encouraged parents to keep children home on June 9, and responded affirmatively to the question whether he would defy the preliminary injunction.

Petitioners' application to the Court of Appeal for a writ to review the contempt order was summarily denied. We granted hearing and ordered issuance of the writ.

Petitioners do not deny the acts the trial court held contemptuous but attack the validity of the restraining order and preliminary injunction. A contempt conviction may be annulled when issuance of the order was beyond the court's authority. (*In re Berry* (1968) 68 Cal.2d 137, 146-149 [65 Cal.Rptr. 273, 436 P.2d 273].)

---

[2]Paragraph 2 of the injunction forbade "doing any act either direct or indirect in furtherance of defendants' strike, including but not limited to ordering, coercing, requesting, or otherwise inducing or attempting to induce an employee of [the district] to refrain from performing his employment duties for the [district] as part of a work stoppage, walk out, or strike against [the district]."

The trial court's opinion holding petitioners in contempt based the validity of the order and injunction on the proposition that public employees have no right to strike. (See *Pasadena Unified Sch. Dist.* v. *Pasadena Federation of Teachers* (1977) 72 Cal.App.3d 100, 105-107 [140 Cal.Rptr. 41]; *Los Angeles Unified School Dist.* v. *United Teachers* (1972) 24 Cal.App.3d 142, 145, 146 [100 Cal.Rptr. 806]; *Trustees of Cal. State Colleges* v. *Local 1352, S.F. State etc. Teachers* (1970) 13 Cal.App.3d 863, 867 [92 Cal.Rptr. 134]; *City of San Diego* v. *American Federation of State etc. Employees* (1970) 8 Cal.App.3d 308 [87 Cal.Rptr. 258]; *Almond* v. *County of Sacramento* (1969) 276 Cal.App.2d 32 [80 Cal.Rptr. 518].) The trial court also relied on section 3549, which states that the EERA "shall not be construed as making the provisions of Section 923 of the Labor Code applicable to public school employees." Labor Code section 923's declaration that workers are to be free from employer interference in "concerted activities for the purpose of collective bargaining or other mutual aid or protection" is generally understood to confer a right to strike. (*Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 687-688 [8 Cal.Rptr. 1, 355 P.2d 905].)

Petitioners contend that the EERA, though excluding Labor Code section 923's protection of the right to strike, does not itself prohibit strikes. The exclusion may be explained, it is argued, by a concern that the wholesale introduction of rules protecting collective bargaining in the private sector into the public sector might conflict with tenure and other aspects of public employment that fall outside the negotiating process mandated by the EERA. (§§ 3540, 3540.1, subd. (h).) Petitioners further contend that strikes by public employees have been outlawed in the past because there were no provisions for public employment collective bargaining (see *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen, supra,* 54 Cal.2d 684, 691; *City of San Diego* v. *American Federation of State etc. Employees, supra,* 8 Cal.App.3d 308, 312). They argue that the EERA's guarantee of the right to participate in organizational activities for "representation on all matters of employer-employee relations" (§ 3543) and for the negotiation of written contracts between public school employers and employee organizations (§ 3540.1, subd. (h)), implies legality of strikes to make the negotiation effective and meaningful.

Responding to Court of Appeal holdings that public employee strikes are illegal, petitioners assert that this court has treated legality as an open question. In *Los Angeles Met. Transit, supra,* this court declared that "[i]n the absence of legislative authorization public employees in general do

not have the right to strike" (54 Cal.2d at p. 687) and went on to hold that a statute giving public transit employees the right "to engage in other concerted activities for the purpose of collectively bargaining or other mutual aid or protection" granted a right to strike. Yet *In re Berry, supra,* 68 Cal.2d 137, which invalidated an injunction against striking county workers as unconstitutionally overbroad, expressly reserved opinion on "the question whether strikes by public employees can be lawfully enjoined" (*id.,* at p. 151). *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403] held that local legislation fixing public employees' compensation was not invalid for having been enacted as a result of the employees' strike even if the strike were illegal. Noting the Court of Appeal holdings that public employees have no right to strike and the employees' contentions that such strikes impliedly are authorized by statute, the unanimous opinion stated, "We have no occasion to resolve this controversy in the present action." (*Id.,* at p. 912.)

Similarly it is unnecessary here to resolve the question of the legality of public employee strikes if the injunctive remedies were improper because of the district's failure to exhaust its administrative remedies under the EERA. (See *Environmental Law Fund, Inc.* v. *Town of Corte Madera* (1975) 49 Cal.App.3d 105, 112 [122 Cal.Rptr. 282].) The exhaustion question was raised but given only scant attention in the trial court.[3] It is extensively briefed here.[4] Three main issues are identified: (1) Could PERB properly determine that the strike was an unfair practice under the EERA? (2) If it made that determination could it furnish relief equivalent to that which would be provided by a trial court? (3) Did the Legislature intend that PERB would have exclusive initial jurisdiction over remedies against strikes that it properly could find were unfair practices?

---

[3]In announcing the preliminary injunction the trial court declared that the EERA's purpose is "the causing of the parties to meet and confer and to otherwise negotiate employer-employee relationships. It does not relate in any way to striking or to collective bargaining. . . . [I]f the [SDTA] was meeting and conferring, and a strike was occurring at the same time, there would be no purpose in the Board coming before the Court to seek to eliminate the strike aspect. It therefore is an independent procedure."

The opinion announcing the contempt orders does not deal with exhaustion. It makes the point, already discussed, that the EERA does not authorize strikes. It states that, in punishing petitioners for contempt, the court took into account that "the strike was called notwithstanding the [EERA], which mandated the very negotiations which were the subject of the strike and also provided the mechanics for evaluating the motives and good faith of the parties to the negotiations. [Petitioners] chose to strong-arm the situation . . . without waiting for the statutory process to be afforded its opportunity to resolve the difficulties between the [district] and the [SDTA]."

[4]In response to a letter from our clerk requesting briefing on the exhaustion issue, we have briefs from the PERB concurred in by two of its members, a dissenting brief from the third member, and briefs in reply from the parties and amici.

### 1.   *Could the strike be ruled an unfair practice?*

By engaging in a strike the SDTA may have committed at least two of the unfair practices forbidden an employee organization that is recognized as exclusive representative: (1) failure to negotiate in good faith (§ 3543.6, subd. (c)), and (2) refusal to participate in the impasse procedure (§ 3543.6, subd. (d)).

The question of negotiation in good faith is resolved by determining whether there was a genuine desire to reach agreement. (*Placentia Fire Fighters* v. *City of Placentia* (1976) 57 Cal.App.3d 9, 25 [129 Cal.Rptr. 126] (construing Meyers-Milias-Brown Act, § 3505).) Under the NLRA a strike does not itself violate the duty to confer in good faith because "[t]he presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." (*Labor Board* v. *Insurance Agents* (1960) 361 U.S. 477, 489 [4 L.Ed.2d 454, 464, 80 S.Ct. 419]; cf. *Lamphere Sch. Dist.* v. *Lamphere Fed. of Tchrs.* (1976) 67 Mich.App. 485 [241 N.W.2d 257] (teachers' strike did not establish failure to bargain in good faith).) Thus if SDTA's strike were held *legal* it would not constitute a failure to negotiate in good faith. As an *illegal* pressure tactic, however, its happening could support a finding that good faith was lacking.

An unfair practice consisting of "refus[al] to participate in good faith in the impasse procedure" (§ 3543.6, subd. (d)) could be evidenced by a strike that otherwise was legal. Section 3548 provides that either the employer or the union may declare an impasse in negotiations and request PERB to appoint a mediator. That must be done if PERB finds that an impasse exists. If the appointed mediator cannot effect settlement and declares that factfinding is appropriate, either party may require appointment of a panel (each party's nominee plus a chairman appointed by PERB) to recommend terms of settlement that then are made public if agreement is not reached. (§§ 3548.1-3548.3.) Meanwhile, mediation efforts are to continue. (§ 3548.4.)

The impasse procedures almost certainly were included in the EERA for the purpose of heading off strikes. (See Comment, *Public Employee Legislation: An Emerging Paradox, Impact, and Opportunity* (1976) 13 San Diego L.Rev. 931, 953.) ■ Since they assume deferment of a strike at least until their completion, strikes before then can properly be found to be a refusal to participate in the impasse procedures in good faith and

thus an unfair practice under section 3543.6, subdivision (d). (See Mathiason et al., The Public School Employer and Collective Bargaining (1977) pp. 219, 285.)

2. *Could PERB furnish relief equivalent to that available in a court action?*

█ The district was not required to exhaust its remedy under the EERA unless PERB could furnish relief equivalent to that which could be provided judicially. (*Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 168 [65 Cal.Rptr. 297, 436 P.2d 297]; cf. *Vargas* v. *Municipal Court* (1978) 22 Cal.3d 902, 912 [150 Cal.Rptr. 918, 587 P.2d 714] [landlord-employer's unlawful detainer action against tenant-employee need not be stayed pending hearing of agricultural union's unfair practice charge for wrongful discharge of employee because ALRB could not order possession restored to landlord].)

Section 3541.3, subdivision (j) authorized PERB to "petition the court for appropriate temporary relief or restraining order," but only "*[u]pon issuance of a complaint* charging that any person has engaged in or is engaging in an unfair practice" (italics added). The EERA does not expressly authorize issuance of complaints but amply implies the authority. Section 3541.5 states circumstances under which PERB may not issue a complaint; section 3541.3, subdivision (k) prohibits delegation of the refusal to issue a complaint. PERB may investigate unfair practice charges and, in that connection, take action and make determinations deemed necessary. (§§ 3541.3, subd. (i), 3541.3, subd. (n).) Any employee, employee organization, or employer may file an unfair practice charge (§ 3541.5, subd. (a)); and "[p]rocedures for investigating, hearing, and deciding these cases shall be devised and promulgated by the board" (§ 3541.5). PERB regulations include provisions for service of charges (Cal.Admin.Code, tit. 8, § 32620, dismissal of charges (§ 32630), filing of an answer (§ 32635), informal settlement conferences (§ 32670), and formal hearing (§§ 32680, 32690).

On the dates of the restraining order and injunction here (June 6 and 8, 1977) there was no announced PERB policy for dealing with requests for injunctive relief. PERB on June 15, 1977, did consider on the merits and deny a union's request that the general counsel of PERB petition for an injunction. (*Service Employee International Union* v. *Fresno Unified School Dist.*, EERB Order No. IR-1.) PERB so far has received 37 requests for injunctive relief; none involved a strike; all were deemed nonmeritorious.

The procedure that PERB implicitly approved in the June 15, 1977, initial denial of injunctive relief was the forwarding of parties' requests for relief to the general counsel, with right of appeal to PERB. On July 5, 1978, it adopted a policy requiring requests for injunctive relief to be in specified form and served on the charged party, who then had two days to "rebut the request," whereupon PERB was to "determine whether or not to issue complaint and seek injunctive relief." That policy was superseded by section 32450, title 8, of the California Administrative Code (added Oct. 3, 1978), which reads: "(a) The Board directs the General Counsel to evaluate pending charges and bring to the Board's attention and advise it as to appropriate cases in which to consider seeking injunctive relief. Under Board direction the General Counsel shall take such action as the Board deems appropriate.

"(b) Requests from parties that the Board seek injunctive relief shall be directed to the General Counsel who shall promptly evaluate the request and advise the Board in regard thereto. Under Board direction the General Counsel shall take appropriate action in regard thereto and advise the parties thereof."

Respondent argues that, because the EERA, unlike the NLRA (29 U.S.C. § 153(d)), does not confer autonomous prosecutorial power on PERB's general counsel, PERB cannot direct him or her to seek temporary injunctive relief against an unfair practice without compromising its neutrality in subsequently hearing the merits of the unfair practice charge. But the EERA does give PERB prosecutorial power (e.g., to "investigate unfair practice charges or alleged violations" and take necessary action—§ 3541.3, subd. (i)) and provides for "a general counsel to assist it in the performance of its functions." That surely implies board power to delegate prosecutorial functions to its general counsel. (Cf. Note, *Due Process and the Combination of Administrative Functions: A Balancing Approach* (1978) 63 Iowa L.Rev. 1186.)

To provide an adequate alternative to a party's own lawsuit for an injunction, PERB's power to apply for injunctive relief should be exercisable in response to any aggrieved party's request, not simply on its own motion. (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 912 [141 Cal.Rptr. 133, 569 P.2d 727].) Sections 3541.3, subdivision (i), 3541.3, subdivision (j), 3541.3, subdivision (n), and 3541.5 empower PERB to seek injunctive relief in unfair practice cases and also to receive, consider, and act on requests from parties that such relief be sought. Though procedures for requests had not formally been prescribed when the

school district here applied for a judicial injunction, we may not assume that PERB would have refused to entertain the district's request for a PERB-sought injunction against the strike since PERB in fact did consider a similar request on its merits only two weeks later.

It is contended, however, that even if PERB could have applied for judicial relief against the strike the grounds on which this might have been done would not necessarily encompass all grounds on which a judicial order could be granted. It is argued that PERB's determination to seek an injunction, as well as its application to the court, would reflect only a narrow concern for the negotiating process mandated by the EERA and would ignore strike-caused harm to the public and particularly the infringement on children's rights to an education. An analogy is drawn to the rule that NLRB jurisdiction to remedy unfair practices does not preempt state suits that present different issues. (See, e.g., *Sears, Roebuck & Co.* v. *Carpenters* (1978) 436 U.S. 180 [56 L.Ed.2d 209, 98 S.Ct. 1745] (antipicketing injunction based on location, rather than on means or objective of pickets); *Farmer* v. *Carpenters* (1977) 430 U.S. 290 [51 L.Ed.2d 338, 97 S.Ct. 1056] (damages action for union's intentional infliction of mental distress); *Youngdahl* v. *Rainfair, Inc.* (1957) 355 U.S. 131 [2 L.Ed.2d 151, 78 S.Ct. 206] (injunction against pickets' violence).)

That argument erroneously presupposes a disparity between public and PERB interests. The public interest is to minimize interruptions of educational services. Yet did not an identical concern underlie enactment of the EERA? The Legislature was aware of the increase in public employee work stoppages despite the availability and use of injunctions and other sanctions to prevent or punish them. (See Cal. Assem. Advisory Council, Final Rep. (Mar. 15, 1973) pp. 197-198; Cebulski, *An Analysis of 22 Illegal Strikes and California Law* (1973) 18 Cal. Pub. Employment Re. 2; Comment, *Public Employee Legislation: An Emerging Paradox, Impact, and Opportunity, supra,* 13 San Diego L.Rev. 931, 935.) It does not follow from the disruption attendant on a teachers' strike that immediate injunctive relief and subsequent punishment for contempt are typically the most effective means of minimizing the number of teaching days lost from work stoppages. As observed in *City and County of San Francisco* v. *Cooper, supra,* 13 Cal.3d 898, 917, the question of appropriate sanctions for illegal strike activity is complex. Harsh, automatic sanctions often do not prevent strikes and are counterproductive. PERB's responsibility for administering the EERA requires that it use its power to seek judicial relief in ways that will further the public interest in maintaining the continuity and quality of educational services.

3. *Does the EERA give PERB exclusive initial jurisdiction over remedies against strikes that it properly could find were unfair practices?*

Petitioners and PERB both invoke an NLRB analogy and argue that PERB had exclusive initial jurisdiction to determine whether the SDTA strike was an unfair practice and, if so, whether temporary judicial relief was appropriate. ■ Neither federal nor state courts may grant relief on grounds that arguably would justify an NLRB remedy against an unfair practice (29 U.S.C. §§ 158, 160) without deferring to the exclusive initial jurisdiction of the NLRB. (*Sears, Roebuck & Co.* v. *Carpenters, supra,* 436 U.S. 180, 186-188, 198 [56 L.Ed.2d 209, 219, 226 (98 S.Ct. 1745)]; *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 245 [3 L.Ed.2d 775, 783, 79 S.Ct. 773].) The aim of that rule is to help bring expertise and uniformity to the delicate task of stablizing labor relations. (*Motor Coach Employees* v. *Lockridge* (1971) 403 U.S. 274, 286-288 [29 L.Ed.2d 473, 482-484, 91 S.Ct. 1909]; *Garner* v. *Teamsters Union* (1953) 346 U.S. 485, 490-491 [98 L.Ed. 228, 239-240, 74 S.Ct. 161].) Though the rule as it relates to NLRB has been enunciated in the context of conflict between a federal agency and state courts, a like principle applies to parallel conflicts between California agencies and courts. (*United Farm Workers* v. *Superior Court* (1977) 72 Cal.App.3d 268, 273 [140 Cal.Rptr. 87] (declaratory relief unavailable when issue could be raised in ALRB proceeding); cf. *Morton* v. *Superior Court* (1970) 9 Cal.App.3d 977 [88 Cal.Rptr. 533] (police officers' suit over terms of employment precluded by failure to resort to grievance procedure).)

There are marked similarities between EERA and NLRA (29 U.S.C. § 151 et seq.). Both are administered by fulltime boards (§ 3541, subds. (a), (c); 29 U.S.C. §§ 153(a), 154(a)). Both boards employ a general counsel (§ 3541, subd. (e); 29 U.S.C. § 153(d)), have rulemaking power (§ 3541.3, subd. (g); 29 U.S.C. § 156) as well as authority over questions of representation (§§ 3541.3, subds. (a), (c), 3544.5, subd. (d), 3544.7, 3545; 29 U.S.C. §§ 153(b), 159) and can investigate, adjudicate, and issue orders against unfair practices (§§ 3541.3, subds. (i), (j), 3541.5; 29 U.S.C. §§ 160, 161). Courts that review or enforce those orders must treat board findings as conclusive if supported by substantial evidence. (§ 3542; 29 U.S.C. §§ 160(e), 160(f).)

■ Further, as if exclusive initial jurisdiction were not amply implied by the comprehensiveness of the EERA scheme, section 3541.5 declares: "The initial determination as to whether the charges of unfair practices are justified, and, if so, what remedy is necessary to effectuate the purposes of this chapter, shall be a matter within the exclusive jurisdiction of the board." In his amicus brief PERB member Gonzales

contends that a comparison of that provision with section 3541.3, subdivision (i), giving PERB power to deal with "unfair practice charges or alleged violations of this chapter," demonstrates that there is no exclusive initial jurisdiction over EERA violations other than unfair practices. He argues that a strike violates section 3549 and, therefore, is outside the exclusive initial jurisdiction. As pointed out above, however, section 3549 does not prohibit strikes but simply excludes the applicability of Labor Code section 923's protection of concerted activities. Moreover, EERA specifies no "unfair practices" but only acts that are "unlawful" (§§ 3543.5, 3543.6) and thus does not segregate unfair practices from other violations.

It is contended that to require the district to apply to PERB before suing for injunctive relief would be to require an idle act because, if PERB had then refused to apply to a court for relief, the district would have been entitled to do so—on the theory that exhaustion of remedies is not required if completion of the administrative proceeding would result in irreparable injury. (See *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 296 [109 P.2d 942, 132 A.L.R. 715]; *Greenblatt* v. *Munro* (1958) 161 Cal.App.2d 596, 605-606 [326 P.2d 929].) But the EERA gives PERB discretion to withhold as well as pursue, the various remedies at its disposal.[5] Its mission to foster constructive employment relations (§ 3540) surely includes the longrange minimization of work stoppages. PERB may conclude in a particular case that a restraining order or injunction would not hasten the end of a strike (as perhaps neither did here) and, on the contrary, would impair the success of the statutorily mandated negotiations between union and employer. A court enjoining a strike on the basis of (1) a rule that public employee strikes are illegal, and (2) harm resulting from the withholding of teachers' services cannot with expertise tailor its remedy to implement the broader objectives entrusted to PERB.

If PERB had declined not only to seek injunctive relief but also to issue an unfair practice complaint, would the district have been without a remedy because a decision of nonissuance is not judicially reviewable? (See § 3542, subd. (b).) Since no declination was made here we need not decide what effect it might have had on the district's right to proceed in

---

[5]Compare *Motor Coach Employees* v. *Lockridge, supra,* 403 U.S. 274, 288 [29 L.Ed.2d 473, 483, 91 S.Ct. 1909]: "The rationale for pre-emption, then, rests in large measure upon our determination that when it set down a federal labor policy Congress plainly meant to do more than simply to alter the then-prevailing substantive law. It sought as well to restructure fundamentally the processes for effectuating that policy, deliberately placing the responsibility for applying and developing this comprehensive legal system in the hands of an expert administrative body rather than the federalized judicial system."

court. (Cf. *San Diego Unions* v. *Garmon, supra,* 359 U.S. 236, 245-246 [3 L.Ed.2d 775, 783-784, 79 S.Ct. 773] [NLRB refusal to exercise jurisdiction does not necessarily empower state court to act].)

The contempt orders are annulled on the ground that PERB had exclusive initial jurisdiction to determine whether the strike was an unfair practice and what, if any, remedies PERB should pursue. Our holding is limited to injunctions against strikes by public school employee organizations recognized or certified as exclusive representatives (§ 3540.1, subd. (e)).

Tobriner, Acting C. J., Mosk, J., and Kaus, J.,* concurred.

RICHARDSON, J.—I respectfully dissent. Petitioners were properly adjudged in contempt for conducting a strike in violation of the express terms of a temporary restraining order and preliminary injunction. As will appear, the strike was clearly unlawful under California law. No statutory right to strike was granted to public employees by the legislative adoption of the Education Employment Relations Act (EERA) (Gov. Code, §§ 3540-3549.3). Contrary to the majority's holding, the Legislature has *not* conferred upon the Public Employment Relations Board (PERB), or any other administrative agency, the authority to deprive a public school employer of its right to seek and obtain injunctive relief to restrain such unlawful activities and to protect the public's interest in the uninterrupted operation of its public schools.

The district's complaint for injunctive relief in the present case alleged that the impact of the illegal teachers' strike would cause *irreparable* injury to the district's educational program and a significant loss of state funds (which are based upon average daily school attendance). Under prior California case law it was well established that a public employer could obtain immediate injunctive relief from the courts to prevent or reduce such irreparable injury or loss. (E.g., *City and County of San Francisco* v. *Evankovich* (1977) 69 Cal.App.3d 41 [137 Cal.Rptr. 883].) The majority now severely limits the public employer's judicial remedy to protect the public interest and requires that it request and obtain PERB's permission in order to invoke judicial relief. The majority suggests that PERB not only has exclusive jurisdiction over strikes by public educational employees but even possesses discretion to refuse to enjoin such strikes consistent with "[i]ts mission to foster constructive employment relations." (*Ante,* p. 13.) Despite the obvious potential irreparable injury

---

*Assigned by the Acting Chairperson of the Judicial Council.

caused by a public employee strike and the evident need for guidance in this area, the majority studiously declines to decide whether the employer may pursue its judicial remedy in the event PERB either refuses to act, or unreasonably delays in doing so. I suggest that, having cast doubt on the recourse of the public employer to its traditional judicial remedies to protect a demonstrable public interest in these cases, we owe the public a full explanation of whatever rights and remedies, if any, it retains to protect itself.

As will appear, I disagree with the majority's premise, reasoning, and result.

1. *Public Employee Strikes are Unlawful*

The majority opinion itself cites five Court of Appeal cases which, without equivocation, hold that public employees have no right to strike in California. (*Ante,* pp. 5-6.) Indeed, we ourselves have fully acknowledged the rule that "In the absence of legislative authorization public employees in general do not have the right to strike . . . ." (*Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 687 [8 Cal.Rptr. 1, 355 P.2d 905].) Yet despite past unanimity of judicial opinion on the subject, the majority finds it "unnecessary here to resolve *the question* of the legality of public employee strikes . . . ." (*Ante,* p. 7, italics added].) Contrary to the majority's suggestion, however, there remains no such "question" to decide, for prior cases which have carefully and thoughtfully analyzed and resolved the issue have ruled that public employee strikes are unlawful in the absence of legislation to the contrary.

I quote at some length from Justice Coughlin's opinion in *City of San Diego* v. *American Federation of State etc. Employees* (1970) 8 Cal.App.3d 308 [87 Cal.Rptr. 258], wherein he painstakingly reviewed the prior authorities in California and in other states, concluding that in the absence of some statutory authorization, public employees have no right to strike against the public. He observed that "This California common law rule is the generally accepted common law rule in many jurisdictions. [Citations, including cases from 24 states.]

"The common law rule has been adopted or confirmed statutorily by 20 states and the federal government. [Citations.]

"The reasons for the rule are many; apply public policy; relate generally to the fundamental differences between private and public employment as regards the processing and settlement of labor demands

and disputes; take into account the authority of the public employer respecting both the method for fixing and the substance of the terms and conditions of public employment is limited to that prescribed by law; include a consideration of the overriding duty of the public employer to perform prescribed governmental functions; and furnish a constitutionally approved basis for classification in the premises. [Citations.] Of particular significance is the fact the employer-employee relationship in public employment is the product of law—constitutional, legislative and decisional—rather than the product of a contract as in private employment. [Citations.] The terms and conditions of public employment are fixed by the public through the process of law, and acceptance of such employment requires acceptance of the processes by which the terms and conditions of employment are fixed, i.e., by law rather than by contract [citation]; confers benefits not available to the private employee which are the product of the processes of law, such as civil service tenure status and a vested right to retirement benefits [citations]; but also imposes a distinct responsibility attendant upon public service [citations]; and results in the relinquishment of certain rights enjoyed by private employees. [Citations.]

". . . The common law rule public employees do not have the right to bargain collectively or to strike is predicated expressly on the necessity for and lack of statutory authority conferring such right. Where a statute authorizes collective bargaining and strikes it includes them within the methods authorized by law for fixing the terms and conditions of employment. *Those who advocate the right of public employees to strike should present their case to the Legislature.* [Italics added.]

". . . . . . . . . . . . . . . . . . . . . . ."

"Wherever the issue has been raised, it has been held laws governing the rights of public employees to engage in union activities, collective bargaining, strikes and other coercive practices, not equally applicable to private employees, and vice versa, are premised on a constitutionally approved classification; and, for this reason, are not violative of the constitutional guarantee of equal protection of the law. [Citations.] [¶] The reasons for the law denying public employees the right to strike while affording such right to private employees are not premised on differences in types of jobs held by these two classes of employees but upon differences in the employment relationship to which they are parties. The legitimate and compelling state interest accomplished and promoted by the law denying public employees the right to strike is not solely the need for a particular governmental service but the preservation of a system of government in the ambit of public employment and the proscription of

practices not compatible with the public employer-employee relationship. [Citation.]" (8 Cal.App.3d at pp. 311-315.)

In the context of teachers' strikes, one commentator has cogently observed that a sound public policy underlies the foregoing established rule. "The use of the strike against the school boards, as against private employers, amounts to an exercise of economic pressure—the stoppage of services to force concessions. But to the extent teachers can wield the strike against the school boards, they wield it also against the public. Should the public be subjected to *economic* pressure? From a political view, the answer would seem to be an unequivocal no. The public should be and is subject to political pressure that is exercised in open channels in the legislative and executive branches of the government. This pressure is tolerable, indeed desirable, because all interested organized groups have access to the same channels of communication and are able to use the same methods of pressure, subject to limitations in relative strength and interest. The people, through the political organs of government, remain the ultimate decisionmakers. Utilization of economic pressure via the strike leaves no room for the free interchange of groups with differing views. The impact on the public can be severe, dramatic, and immediate. The school board, having an obligation to the public to provide a continuing service, has little discretion in its adjustment to the strike. To halt the stoppage, some concession will usually have to be made; and, when such steps are taken, the teachers and not the board decide the issues. At that point, public sovereignty is at its lowest ebb. Though the board is still accountable to the electorate, the power of the strike enables the teachers to compel decisions possibly inconsistent with the wishes of the public's representatives.

"Since the teacher's expertise is a justification for his power to bargain collectively, one may argue that the same rationale should be applied to his use of the strike, particularly since this power is used to make collective bargaining effective. Except for the fact that the powers of bilateral control and the strike are exercised in much different situations, the argument might carry considerable weight. In the case of bilateral control, the board has the power to make concessions and to determine the shape of its counterproposals. This freedom of action is greatly constricted when the board must make decisions under the pressure of a strike. Against the expertise of the teacher must be balanced the interest of the public in retaining control over educational decisionmaking in the hands of its representatives. Although teacher expertise might justify a role for teachers in the decisionmaking process, it cannot justify the use of an economic weapon that places the balance of power in the hands of the teachers. This is particularly true when the strike is used to compel higher

wages, a matter only peripherally related to teacher expertise." (Note, *Collective Bargaining and the California Public Teacher* (1969) 21 Stan.L.Rev. 340, 375-376, italics in original, fn. omitted.)

It is well and widely accepted that education ranks among the highest and most important of public purposes. We ourselves have said that public education is a *fundamental* interest (*Serrano v. Priest* (1976) 18 Cal.3d 728, 766 [135 Cal.Rptr. 345, 557 P.2d 929]) which is "essential to the preservation of the rights and liberties of the people . . . ." (Cal. Const., art. IX, § 1.) It follows, accordingly, that a strike which might be tolerated in the private sector as a legitimate economic weapon, must necessarily be held unlawful when it becomes a strike against the sovereign public itself as applied to educational employment, for it is pointed and directed against a function essential to "the rights and liberties of the people." (*Ibid.*)

Since the majority elects not to pursue the point, I will forego further discussion beyond noting, however, that as recently as 1977, in a case declaring unlawful a strike *by public school employees,* the appellate court reiterated the views of a 1972 case that " 'no benefit . . . would result from our reanalyses of the same issues which the . . . (omission in original) cited opinions have exhaustively treated, with extensive citation of authority.' " (*Pasadena Unified Sch. Dist.* v. *Pasadena Federation of Teachers* (1977) 72 Cal.App.3d 100, 107 [140 Cal.Rptr. 41].) We *unanimously* denied a hearing in the *Pasadena* case. If there are lurking majority reservations regarding an important principle of law which has been treated as settled for so long, surely there is an obligation to set forth those views openly and candidly.

In reexpressing the reasons for the long established conclusion that public employee strikes are illegal, we could repeat with Justice Coughlin the words of the late President Franklin D. Roosevelt, long recognized as an historic friend of labor: " 'Particularly, I want to emphasize my conviction that militant tactics have no place in the functions of any organization of Government employees . . . . [A] strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of Government until their demands are satisfied. Such action, looking toward the paralysis of Government by those who have sworn to support it, is unthinkable and intolerable.' [Citations.]" (8 Cal.App.3d at p. 316.)

### 2. *Right to Strike Under the EERA*

As indicated above, the prior cases have held that despite the illegality of public employee strikes at common law, the Legislature may, if it so

chooses, act to grant the right to strike to some or all public employees. For example, we held in *Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen, supra,* 54 Cal.2d 684, 687-689, that legislation which confers on a particular class of employee the right to engage in "concerted activities" for the purpose of collective bargaining or mutual aid or protection (see, e.g., Lab. Code, § 923, as to private employees), would confer the right to strike peacefully to enforce union demands.

Conversely, it also has been held that legislation which purports to deprive a particular class of employee of the right to engage in concerted activities, or which withholds the applicability of the provisions of Labor Code section 923, demonstrates a legislative intent to withhold the right to strike. (*Pasadena Unified Sch. Dist.* v. *Pasadena Federation of Teachers, supra,* 72 Cal.App.3d 100, 106; *Almond* v. *County of Sacramento* (1969) 276 Cal.App.2d 32, 37-38 [80 Cal.Rptr. 518].)

The majority acknowledges that the EERA, under section 3549 of the Government Code, expressly provides that "The enactment of this chapter [regarding meeting and negotiating in public educational employment] *shall not be construed as making the provisions of Section 923 of the Labor Code applicable to public school employees . . . ."* (Italics added.) Because section 923 declares as a public policy the right of a private worker to engage "in other concerted activities," judicially defined as including the right to strike (*Los Angeles Met. Transit Authority, supra,* at p. 689), it seems to me inescapable that the foregoing language of section 3549 conclusively establishes the Legislature's intent to deny this weapon to public school employees. Indeed, this very language was held in *Pasadena* to constitute a legislative affirmance of an intent "to withhold the right to strike from public educational employees." (72 Cal.App.3d 100, 106-107; see *Almond* v. *County of Sacramento, supra,* 276 Cal.App.2d 32, 37-38.)

The majority's disposition of section 3549 is wholly unsatisfactory in its insistence that ". . . section 3549 does not prohibit strikes but simply excludes the applicability of Labor Code section 923's protection of concerted activities." (*Ante,* p. 12.) In my view, the argument is manifestly wrong, as the above quoted *Pasadena* holding indicates. To the contrary, by withholding the *protection* of section 923 the Legislature necessarily retained the preexisting *prohibition* against all public employee strikes.

Therefore, in examining those sections of EERA relied on by the majority, we should bear in mind that, *under EERA's own provisions,* public school strikes remain unlawful.

### 3. *PERB's Exclusive Jurisdiction Over Unfair Practices*

Section 3541.5 of the Government Code vests exclusive jurisdiction in PERB with respect to "The initial determination as to whether the charges of unfair practices are justified, and, if so, what remedy is necessary to effectuate the purposes of this chapter . . . ." The majority interprets this language as authorizing PERB to decide initially, to the exclusion of the courts, whether a public employee strike should or should not be enjoined. To the contrary, nothing in EERA would support the view that the Legislature intended to divest courts of their traditional equitable jurisdiction over public strikes or any other unlawful activities which threaten irreparable injury. Such injunctive relief would not impair PERB's functions in any way, but would simply preserve the status quo while the parties mediate the merits of their dispute through PERB proceedings.

As becomes readily apparent from an examination of its provisions, EERA was designed to provide a commendable forum whereby disputes between public school employees and employers might be discussed, mediated and resolved. The unfair and unlawful practices which fall within PERB's jurisdiction include such acts as discrimination or coercion of employees, refusal to negotiate or participate in impasse procedures, and interference with employee organizations. (See Gov. Code, §§ 3543.5, 3543.6.) However, EERA nowhere mentions a strike by public school employees as one of the practices which is subject to PERB's jurisdiction, and the Legislature's express refusal to validate such concerted activity (*id.,* § 3549) necessarily would preclude PERB from exercising jurisdiction over such strikes, or doing any act which might encourage or prolong such unlawful conduct.

The principal thesis of the majority holding is that "the EERA gives PERB discretion to withhold as well as pursue, the various remedies at its disposal . . . . PERB may conclude in a particular case that a restraining order or injunction would not hasten the end of a strike . . . and, on the contrary, would impair the success of the statutorily mandated negotiations between union and employer. A court enjoining a strike on the basis of (1) a rule that public employee strikes are illegal, and (2) harm resulting from the withholding of teachers' services cannot with expertise tailor its remedy to implement the broader objectives entrusted to PERB." (*Ante,* pp. 12-13.) By thus construing EERA, the majority permits PERB to validate a public strike by refusing to enjoin it. The

majority thereby indirectly accomplishes precisely the result which the Legislature so carefully and specifically sought to prevent—the conferral of a right to strike on public school employees. Therefore, despite the majority's declaration that it leaves the "question" of public strikes open for future decision, the public as employer seeking to enjoin such strikes may henceforth find the courtroom doors firmly closed.

The majority opinion is deeply troubling in one further respect. The majority concludes that it "need not decide" whether a school district may pursue its traditional judicial remedies if PERB should decline either to seek injunctive relief on its own or to issue an unfair practice complaint against the striking employees. (*Ante,* p. 13.) The fair implications of such a principle are indeed startling. Consideration of this issue, in my view, should not be deferred but demands our immediate attention so that the lower courts will have guidance, for one can readily envision the following circumstances occurring with frequency: A strike is called hurriedly to coerce a settlement of the strikers' demands; irreparable harm ensues; the district rushes to PERB requesting immediate relief; PERB delays or withholds action pending its discretionary consideration of the "broader objectives" which the majority now places within its exclusive jurisdiction, or for other reasons satisfying to itself. Meantime, the entire public school system and its programs are held hostage to a combination of strikers' demands and PERB's inertia. It is inconceivable to me that the Legislature would seriously have intended such public impotence.

In this instance, teachers' union officials studiously, with full knowledge of the consequences and with full ability to comply, chose to defy an express order of a court whose powers were properly invoked in the field of education, an area of continuing and consuming public interest. I cannot believe that the Legislature under such circumstances intended to strip from courts their traditional equitable powers, thereby leaving the public helpless and without a remedy to protect itself.

In such a situation petitioners should be treated no differently than any other contemner. I would affirm the orders of contempt.

Clark, J., and Manuel, J., concurred.

Respondent's petition for a rehearing was denied May 10, 1979. Bird, C. J., did not participate therein. Kaus, J.* participated therein. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.

*Assigned by the Acting Chairperson of the Judicial Council.