**ALASKA PUBLIC EMPLOYEES ASSOCIATION, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF ADMINISTRATION, DIVISION OF LABOR RELATIONS, Appellee.**

**PUBLIC EMPLOYEES LOCAL 71, AFL–CIO, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF ADMINISTRATION, DIVISION OF LABOR RELATIONS and Alaska Public Employees Association, Appellee.**

Nos. S–2642, S–2659.

Supreme Court of Alaska.

June 30, 1989.

William K. Jermain and Robert A. Royce, Jermain, Dunnagan & Owens, P.C., Anchorage, for appellant APEA.

Kevin Dougherty, Anchorage, for appellant Local 71.

W.D. Bennett, Perkins Coie, Anchorage, for appellees.

Before MATTHEWS, C.J., RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

### I

These consolidated appeals address the state's right to unilaterally change employment terms governing Class II and Class III employees before the employees hold a strike vote. The superior court ruled that the state's unilateral change of wage and employment conditions of Class II and Class III employees did not violate the Public Employment Relations Act (PERA), AS 23.40.070.—23.40.260, or article I, section 18 of the Alaska Constitution. We affirm.

### II

The Alaska Public Employees Association (APEA) and Public Employees Local 71 are certified labor organizations. APEA represents 8,000 Class I, II, and III employ-

ees. Local 71 represents 1,600 Class I, II, and III employees.

Under PERA, employees are divided into three classes, I, II, and III. Class I employees[1] may never strike because their services are necessary for the public's protection. AS 23.40.200(b). Class II employees[2] have a limited right to strike. AS 23.40.200(c). After an impasse in negotiations, Class II employees must submit to mediation. *Id.* If mediation fails, Class II employees can strike upon a majority vote of the employees. *Id.* The employees can only continue to strike as long as the public's health, safety or welfare is not endangered. *Id.* The public employer can seek to enjoin the strike. If the strike is enjoined and the parties are still at an impasse, the parties "shall submit to arbitration." *Id.* Class III employees, all other employees, can also strike after an impasse in negotiations as long as a majority of the employees vote by secret ballot for a strike. AS 23.40.200(d).

APEA and the state were parties to a collective bargaining agreement in effect between April 1984 and June 1987.[3] Local 71 and the state also had a collective bargaining agreement in effect from April 1984 until January 1987.

The state and the unions were not able to agree on a new contract after the agreements expired. Although the parties honored the original agreements during negotiations, on October 6, 1987, the state notified APEA, and on August 11, 1987, notified Local 71, that it would implement unilateral changes in the terms and conditions of employment effective October 16, 1987.[4] APEA and the state stipulated that their negotiations were at an impasse on October 16, 1987.

The unions sought declaratory and injunctive relief from the imposition of unilateral contract changes. The superior court entered an order temporarily restraining the state from unilaterally increasing the work week from 37.5 to 40 hours and from taking away a Monday holiday but denied all other injunctive relief requested by the unions. The state later agreed to reinstate the former wages and terms of employment while this litigation was pending.[5]

On February 11, 1988, Superior Court Judge Brian C. Shortell ruled on the declaratory judgment brought by the unions and held that the state may change terms and conditions of employment of Class II and Class III employees upon an impasse in negotiations whether or not the employees have held a strike vote.[6] The court also ruled that the employees were not deprived of property without just compensation by the unilateral imposition of contract terms. The unions appealed these rulings.

### III

APEA and Local 71 argue that AS 23.40.200 prohibits the state from imposing unilateral contract changes before Class II and Class III employees conduct a strike vote. The state contends that it may

---

1. Class I employees are employed as "police and fire protection employees, jail, prison and other correctional institution employees, and hospital employees." AS 23.40.200(b).

2. Class II employees are employed as "public utility, snow removal, sanitation, and public school and other educational institution employees." AS 23.40.200(c).

3. APEA and the state originally entered into a collective bargaining agreement which expired on December 31, 1986, but which was extended by mutual consent until June 30, 1987.

4. The state sought to change employment hours, leave accrual, and overtime and holiday provisions.

5. APEA and the state entered into a stipulation which provided that the former terms and conditions of employment would remain in effect until (a) a decision was rendered by the Alaska Superior Court, or if appealed, the Supreme Court; (b) legislation was passed; or (c) the parties reached an agreement.

6. As to Class I employees, the court ruled that unilateral implementation of contract terms could not take place until the arbitration procedures contained in AS 23.40.200(b) had been exhausted or the parties had mutually agreed to forego arbitration. Therefore, the court stayed implementation of the state's contract changes as to these employees. This ruling is not at issue on appeal.

impose unilateral changes when the parties reach an impasse in negotiations.

The dispute resolution process for public employees is governed by PERA.[7] One of the primary purposes of the act is to provide guidelines for public employment relations. AS 23.40.070. PERA attempts to balance the state's need for uninterrupted services and the employees' need for effective bargaining tools. However, PERA does not expressly permit or prohibit the state from unilaterally changing contract terms.

We look first to the National Labor Relations Act (NLRA), 29 U.S.C. §§ 159–68 (1982), for guidance. We have followed federal decisions interpreting the NLRA

when the provisions of the NLRA are similar to state statutes.[8] *See Alaska Community Colleges' Fed'n of Teachers, Local 2404 v. University of Alaska,* 669 P.2d 1299 (Alaska 1983); *Northwest Arctic Regional Educ. Attendance Area v. Alaska Pub. Serv. Employees, Local 71,* 591 P.2d 1292, 1295 n. 5 (Alaska 1979); *Alaska Pub. Employees Ass'n v. Municipality of Anchorage,* 555 P.2d 552, 553 (Alaska 1976).

The NLRA does not directly address the question of whether an employer can unilaterally implement contract terms after an impasse in negotiations. However, certain principles have been established in decisions addressing the question whether unilateral implementation of contract terms is

---

7. AS 23.40.200 provides in part:
(a) For purposes of this section, public employees are employed to perform services in one of the three following classes:
(1) those services which may not be given up for even the shortest period of time;
(2) those services which may be interrupted for a limited period but not for an indefinite period of time; and
(3) those services in which work stoppages may be sustained for extended periods without serious effects on the public.
(b) The class in (a)(1) of this section is composed of police and fire protection employees, jail, prison and other correctional institution employees, and hospital employees. Employees in this class may not engage in strikes. Upon a showing by a public employer or the labor relations agency that employees in this class are engaging or about to engage in a strike, an injunction, restraining order, or other order which may be appropriate shall be granted by the superior court in the judicial district in which the strike is occurring or is about to occur. If an impasse or deadlock is reached in collective bargaining between the public employer and employees in this class, and mediation has been utilized without resolving the deadlock, the parties shall submit to arbitration to be carried out under AS 09.43.030.
(c) The class in (a)(2) of this section is composed of public utility, snow removal, sanitation and public school and other educational institution employees. Employees in this class may engage in a strike after mediation, subject to the voting requirement of (d) of this section, for a limited time. The limit is determined by the interests of the health, safety or welfare of the public. The public employer or the labor relations agency may apply to the superior court in the judicial district in which the strike is occurring for an order enjoining

the strike. A strike may not be enjoined unless it can be shown that it has begun to threaten the health, safety or welfare of the public. . . . If an impasse or deadlock still exists after the issuance of an injunction, the parties shall submit to arbitration to be carried out under AS 09.43.030.
(d) The class in (a)(3) of this section includes all other public employees who are not included in the classes in (a)(1) or (a)(2) of this section. Employees in this class may engage in a strike if a majority of the employees in a collective bargaining unit vote by secret ballot to do so.

8. Under the NLRA, impasse is "a temporary deadlock or hiatus in negotiations 'which in almost all cases is eventually broken, through either a change of mind or the application of economic force.'" *Bonanno Linen Serv., Inc. v. NLRB,* 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656, 664 (1982) (citation omitted). In *Bonanno,* the United States Supreme Court accepted the NLRB's view that during NLRA impasse, "bargaining is temporarily replaced by economic warfare." *Bonanno,* 454 U.S. at 412 n. 8, 102 S.Ct. at 725 n. 8, 70 L.Ed.2d at 664 n. 8. Similarly, we hold that once a good faith impasse has been reached, the parties may use whatever legal tools they have available to them to obtain their desired result. Because our definition of impasse more closely resembles the definition of impasse under the NLRA than the Federal Railway Labor Act or the California Employment Relations Act, we rely on the NLRA and not the Federal Railway Labor Act or the California Employment Relations Act.

Additionally, we do not address whether unilateral changes in working conditions should be barred during the period that the state seeks to enjoin Class II strikes or during the period of any resulting arbitration because this issue is not before this court.

an unfair labor practice under section 158(d)[9] of the NLRA.

An employer that implements unilateral changes in the conditions of employment during contract negotiations without consulting the union violates the duty to bargain collectively. *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 674, 101 S.Ct. 2573, 2578, 69 L.Ed.2d 318, 328 (1981); *NLRB v. Katz*, 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230, 236 (1962). When an impasse occurs, after the breakdown of good faith negotiations, the employer is free to unilaterally implement terms of employment, provided the changes were offered to the union during the bargaining process. *Id.*

However, an employer cannot purposefully negotiate in bad faith in order to cause an impasse and then impose a unilateral change in working conditions. *NLRB v. Southwest Sec. Equip. Corp.*, 736 F.2d 1332, 1337 (9th Cir.1984) ("The well-established presumption is that an employer violates his § 8(a)(5) duty to bargain in good faith if he unilaterally changes the terms of a collective agreement, even after that agreement has expired. [A unilateral change will not be allowed] until the parties negotiate a new agreement or bargain in good faith to impasse."). The question whether the parties negotiated to impasse in good faith must be determined on a case-by-case basis. *NLRB v. Yama Woodcraft, Inc.*, 580 F.2d 942, 944 (9th Cir.1978), (quoting *Dallas Gen. Drivers, W. & H., Local 745 v. NLRB*, 355 F.2d 842, 845 (D.C.Cir.1966)). Thus, in certain cases,

even if the unilateral policy change has first been presented to the union on the bargaining table, its imposition may not be permitted. *Saunders House v. NLRB*, 719 F.2d 683, 688 (3d Cir.1983) ("A concession by one party on a significant issue in dispute precludes a finding of impasse even if a wide gap between the parties remains because under such circumstances there is reason to believe that further bargaining might produce additional movement."). However, whether the parties have reached a good faith impasse is not at issue in this case because the parties stipulated that they had reached a good faith impasse.

Applying these principles to the instant cases, we believe that the state may implement unilateral contract changes when negotiations reach an impasse. For Class II employees, an impasse is reached when the parties have reached a good faith impasse and the mediation process has been exhausted. For Class III employees, an impasse is reached when negotiations are deadlocked.[10]

## IV

APEA and Local 71 assert that the employees were deprived of property without just compensation when the state demanded that they work longer hours for less pay. Alaska Const. art. I, § 18.[11]

In order to state a claim under article I, section 18, the employees must have been deprived of a property interest. We have already ruled that the employees have no right to be paid according to the plan in AS

---

**9.** 29 U.S.C. § 158(d) (1982) requires collective bargaining "with respect to wages, hours, and other terms and conditions of employment." Collective bargaining is defined as follows:

(d) ... [T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession....

Section 158(d) is substantially similar to AS 23.40.250(1).

**10.** The unions argue that, even if the state may implement the terms and conditions of employment, it may not impose a pay plan contrary to that set forth in AS 39.27.011. This argument is without merit. By its terms, AS 39.27.011 does not apply to "members of a collective bargaining unit established under the authority of the Public Employment Relations Act." Therefore, upon impasse, the state may unilaterally implement a pay plan different from that set out in the statute.

**11.** Alaska Const. art. I, § 18 provides that "[p]rivate property shall not be taken or damaged for public use without just compensation."

39.27.011; absent a legal entitlement, they were not deprived of property by the salary reduction.

Although an individual may be entitled to just compensation when his labor is taken, *DeLisio v. Alaska Superior Court*, 740 P.2d 437, 439–43 (Alaska 1987), the employees have no legal right to work a week totalling thirty-seven and one-half hours. Once a collective bargaining agreement has expired, the continuation of existing terms and conditions is a mere expectancy. *Cf. Stroh v. Alaska State Hous. Auth.*, 459 P.2d 480, 482 (Alaska 1969) (tenant's expectation of renewal of a lease was not a compensable interest). Therefore, the employees were not deprived of property by the extension of their work hours.

The unilateral contract changes imposed by the state did not deprive the employees of a property interest protected by article I, section 18.

AFFIRMED.

RABINOWITZ, Justice, concurring.

I agree with the various holdings in this opinion. However, I disagree with the court's exclusive reliance on the NLRA for purposes of determining when the state may unilaterally change the terms of class II employee contracts under PERA.[1]

In part the NLRA is designed so that upon a good faith impasse, parties can break off negotiations to pursue their respective interests through "economic warfare." In particular, a union may respond to what it deems to be an unfair unilateral change in working conditions by striking.[2] The NLRA provides a statutory scheme in which both the requirement of good faith negotiations, "and the availability of economic pressure devices to each to make the other party incline to agree on one's terms,

exist side by side.... Doubtless one factor influences the other...."[3]

PERA, as it pertains to class II employees, embodies a scheme which compromises the parties' right to use economic force in exchange for certain dispute resolution provisions. Under PERA, class II employees are granted a qualified right to strike. However, strikes are not permitted until after mediation procedures have been exhausted. Furthermore, the state can seek an injunction to force the union to submit to arbitration. AS 23.40.200(c). Thus, unlike the NLRA, PERA provides for mandatory dispute resolution devices. The difference in these statutory schemes comes into play when negotiations are deadlocked.

A union governed by the NLRA may forcefully respond to an employer's imposition of unilateral changes at impasse.[4] On the other hand, if the state were permitted under PERA to impose unilateral changes during a compulsory mediation or arbitration period, the union would be restrained by statute from responding. Employees under PERA are unable during these periods to resort to "economic warfare."

In my view the policy basis for holding that unilateral changes may not be imposed during statutory mediation periods are as follows: First, since employees are precluded by statute from striking during mediation periods, it would be unfair to allow an employer, shielded from employee economic force, to impose unilateral changes in working conditions. Second, if an employer were permitted to impose unilateral changes during mediation, it would have less incentive to bargain over the issues subject to the change. This latter conclusion was reached by a California appellate court in applying a public sector labor act with mediation provisions similar to PERA's.[5] In considering the issue of em-

1. "No provision in Alaska's labor statutes mandates that ... the NLRA be employed as [an] interpretive aid[ ] ... [where the statutes have] different purposes and policies...." *United Food and Commercial Workers Union v. D & A Supermarkets, Inc.*, 688 P.2d 165, 168 (Alaska 1984).

2. This is permitted even before the parties have reached an impasse. *NLRB v. Insurance Agents'*

*Int'l Union, AFL–CIO*, 361 U.S. 477, 493–95, 80 S.Ct. 419, 429–30, 4 L.Ed.2d 454, 467 (1960).

3. *Id.* at 489, 80 S.Ct. at 427, 4 L.Ed.2d at 464.

4. *Id.*

5. *Moreno Valley Unified School Dist. v. Public Employment Relations Bd.*, 142 Cal.App.3d 191, 191 Cal.Rptr. 60, 65 & n. 4 (Cal.App.1983). The

ployer unilateral changes during mandatory "no-strike" mediation periods, the court explained that their allowance would serve to undermine mediation efforts, as the employer would "lose[ ] incentive to participate in the dispute resolution process." [6]

In order to resolve the problems unique to PERA by analogy to federal labor law, the court holds that "impasse" does not occur at the time negotiations become deadlocked. Rather, the majority holds that "impasse" occurs only after the statutory mediation period which follows deadlock. *See* AS 23.40.190 (mediation to begin after negotiation deadlock). Though I agree with the conclusion that impasse occurs not at deadlock, but only after the statutory mediation period which follows deadlock, I am of the view that this result flows more logically from the principles set forth above than from the provisions of the NLRA.

California Educational Employment Relations Act provides for non-binding mediation upon impasse, during which strikes are forbidden. Cal. Gov't Code §§ 3548–3548.8; *San Diego Teachers' Ass'n v. Superior Court,* 24 Cal.3d 1, 154 Cal.Rptr. 893, 593 P.2d 838, 843 (1979) (prohibition against strikes during mediation "assumed" to be part of statutory scheme, though not expressly stated in act).

6. *Moreno,* 191 Cal.Rptr. at 65 & n. 4. Public sector labor laws such as PERA and the California act discussed in *Moreno* generally involve some dispute resolution process to be "substituted for direct economic action." B. Justice, *Unions, Workers and the Law* 248 (1983). Accordingly, decisions under such laws can serve to provide guidance in resolving questions of the type presented here.